**In re Application of NATIONAL BROADCASTING COMPANY, INC., American Broadcasting Companies, Inc., and CBS, Inc.**

**No. 80–2427.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 28, 1981.

Decided April 27, 1981.

---

Floyd Abrams, New York City, with whom Donald J. Mulvihill, Washington, D. C., was on the brief, for appellants.

Dennis M. Hart, Washington, D. C., with whom Kenneth Michael Robinson, Washington, D. C., was on the brief for appellee, Jenrette.

Charles F. C. Ruff, U. S. Atty., John A. Terry, Michael W. Farrell, John T. Kotelly and Michael S. Pasano, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee, United States.

Before MacKINNON, WILKEY and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

Appellants National Broadcasting Company, Inc., American Broadcasting Companies, Inc., and CBS Inc. ("the broadcasters") contend that the district court abused its discretion in denying their post-trial application for permission to copy the video and audio tapes introduced into evidence and played to the jury during the criminal trial of *United States v. John W. Jenrette and John R. Stowe.* We agree and reverse. We leave the door open on remand, however,

for innocent third persons who are mentioned on the tapes to file objections to release of those portions of the tapes which would inflict unwarranted injury upon them.

## I.

On June 13, 1980, an indictment was filed in the United States District Court for the District of Columbia charging John Jenrette and John Stowe with violations of 18 U.S.C. § 201(c)[1] and 18 U.S.C. § 371.[2] Jenrette is a former three term Congressman from the Sixth District of South Carolina; Stowe is a private citizen. These charges arose out of the Federal Bureau of Investigation's "ABSCAM"[3] investigation into possible congressional corruption, in which several high federal, state, and local government officials allegedly agreed to perform governmental favors for certain individuals posing as "Middle Eastern businessmen" in return for bribes. The "businessmen" were actually undercover FBI agents, and the bribe moneys were furnished by the government.

At trial a principal part of the government's case consisted of video and audio tapes upon which the FBI agents had surreptitiously recorded the defendants' statements, conduct, and response to the offers of the "foreign businessmen". Members of the press and public who attended the trial saw and heard these tapes as they were played in court. Typewritten transcripts of the audio tapes were released to the media after the tapes were played in the courtroom. Transcripts of the conversations recorded on the video tapes, however, were not so distributed. Guilty verdicts were returned on all counts.

After the trial the broadcasters applied to the court for permission to copy, for the purpose of broadcasting to the public, the video and audio tapes which had been introduced at trial.[4] The parties to the criminal trial all filed responses to the application; defendant Jenrette opposed it, defendant Stowe took "no position" thereon, and the United States, after initially supporting it, adopted a "neutral position".[5] The district

---

1. 18 U.S.C. § 201(c) provides:
   Whoever, being a public official or person selected to be a public official, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for:
   (1) being influenced in his performance of any official act; or
   (2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
   (3) being induced to do or omit to do any act in violation of his official duty [ ]
   [shall be fined not more than $20,000 or three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.]
   18 U.S.C. § 201(c).

2. 18 U.S.C. § 371 provides:
   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor. 18 U.S.C. § 371.

3. The term "ABSCAM" results from combining the first two letters of "Abdul Enterprises, Ltd.," the fictitious entity which the "businessmen" allegedly represented, and the word "scam", which in current street dialect denotes "a con game or swindle." William and Mary Morris, *Morris Dictionary of Word and Phrase Origins*, 502 (1971).

4. Prior to the commencement of the trial, the broadcasters requested permission to copy the tapes which would be introduced as evidence at the upcoming trial. In a brief order the trial court, noting the opposition of all parties to the trial to the application, denied the request. Joint Appendix ("App.") at 38. Since no appeal was taken from this order, the issues raised thereby are not before us, and we intimate no view on their merits.

5. The government's initial response was premised on its belief that "at this stage of the proceedings the general public's right to access to the evidence outweighs [sic] any interest of the defendants to limit knowledge of the voices

court heard oral argument on the request, issued a brief order denying the application and later filed a memorandum opinion.[6]

The district court concluded, after "[b]alancing all arguments both for and against the release", that "the potential damage in the event of release of the tapes outweighs any benefit to the public if the tapes are released".[7] The primary justification for this conclusion was the district court's fear, articulated in a variety of ways, that it would be difficult to empanel a fair and impartial jury if the tapes were televised and a retrial of the case was required. The court also stated that it would be unfair to the defendants to release the tapes at that time, for the court had yet to rule on their motions to dismiss the indictment because of alleged governmental violations of "fundamental fairness" and due process. Finally, the court was concerned that release of the tapes would injure innocent third persons who were mentioned on the tapes. Although the court recognized the public interest in the conduct of public officials,[8] it concluded that this interest did not overcome those which weighed against the requested release, since the press and public had been given full access to the courtroom during the trial and the case had been widely reported in the press and media.[9]

The broadcasters appealed from the court's order and a motion panel of this court granted their motion for expedited review.

## II.

As all parties agree, the existence of the common law right to inspect and copy judicial records is indisputable.[10] This right "serves the important function of ensuring the integrity of judicial proceedings in particular and of the law enforcement process more generally."[11] And although the right was first recognized at a time when records were documentary in nature, it is now settled that the right extends to records which are not in written form, such as audio[12] and video[13] tapes.

and images contained in the tapes to those persons who were able to attend the trial." App. at 91. The government later changed its position to one of neutrality because of a civil action Jenrette had filed against it prior to the commencement of the criminal trial. App. at 124. In this action, Jenrette seeks declaratory, injunctive and compensatory relief for the alleged violations of his constitutional and statutory rights that are alleged to have occurred during the ABSCAM operation. *See Jenrette v. Abdul Enterprises, Ltd., et al.*, Civil No. 80–1451; App. at 72–88.

The government in this court has adhered to its neutral stance. The government states that although appellants have advanced "strong reasons" why the application should have been granted, the government remains "sensitive" to Jenrette's concerns and those expressed by the district court. Brief For Appellee United States of America at 5.

**6.** *See In Re Application of National Broadcasting Co. Inc.*, Misc. No. 80–260 (D.D.C. November 19, 1980), *reprinted in* App. at 117–127.

**7.** *Id.*, slip op. at 11; App. at 127.

**8.** *Id.*

**9.** *Id.*

**10.** *United States v. Myers*, 635 F.2d 945 at 949 (2d Cir. 1980); *United States v. Hubbard*, 650 F.2d 293 at 314 (D.C.Cir. 1980); *United States v. Mitchell*, 551 F.2d 1252, 1258 (D.C.Cir. 1976), *rev'd on other grounds sub nom. Nixon v. Warner Communications Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978).

**11.** *Hubbard, supra*, 650 F.2d at 315. *See Mitchell, supra*, 551 F.2d at 1258:

This common law right is not some arcane relic of ancient English law. To the contrary, the right is fundamental to a democratic state. As James Madison warned, "A popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy: or perhaps both.... A people who mean to be their own Governors, must arm themselves with the power which knowledge gives." Like the First Amendment, then, the right of inspection serves to produce "an informed and enlightened public opinion." Like the public trial guarantee of the Sixth Amendment, the right serves to "safeguard against any attempt to employ our courts as instruments of persecution," to promote the search for truth, and to assure "confidence in ... judicial remedies."

**12.** *Mitchell, supra*, 551 F.2d at 1258 n.21.

**13.** *Myers, supra*, 635 F.2d at 950.

▮ It is equally clear, however, that the right to inspect and copy judicial records is not absolute.[14] Rather, as we observed in *Hubbard*: [15]

> the tradition of access is not without its time-honored exceptions:
>
> > Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case." Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption, or as sources of business information that might harm a litigant's competitive standing.
>
> [*Nixon v. Warner Communications*, 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978)] (citations omitted). The public has in the past been excluded, temporarily or permanently, from court proceedings or the records of court proceedings to protect private as well as public interests: to protect trade secrets, or the privacy and reputation of victims of crimes, as well as to guard against risks to national security interests, and to minimize the danger of an unfair trial by adverse publicity.

Because of the difficulties inherent in formulating a broad yet clear rule to govern the variety of situations in which the right of access must be reconciled with legitimate countervailing public or private interests, the decision as to access is one which rests in the sound discretion of the trial court.[16]

▮ This discretion, however, is not open-ended. Rather, access may be denied only if the district court, after considering "the relevant facts and circumstances of the particular case",[17] and after "weighing the interests advanced by the parties in light of the public interest and the duty of the courts",[18] concludes that "justice so requires".[19] The court's discretion must "clearly be informed by this country's strong tradition of access to judicial proceedings".[20] In balancing the competing interests, the court must also give appropriate weight and consideration to the "presumption—however gauged—in favor of public access to judicial records."[21] Any denial or infringement of this "precious"[22] and "fundamental"[23] common law right remains subject to appellate review for abuse.[24]

### III.

▮ We now consider whether the district court abused its discretion in denying the broadcasters' *post-trial* application to inspect and copy the video and audio tapes. The broadcasters argue that the court erred by failing to give sufficient weight to the interests weighing in favor of the application and by failing to follow our decision in

---

14. *Nixon, supra*, 435 U.S. at 598, 98 S.Ct. at 1312; *Hubbard, supra*, 650 F.2d at 316; *Mitchell, supra*, 551 F.2d at 1260.

15. *Hubbard, supra*, 650 F.2d at 315–316 (footnotes omitted).

16. *Nixon, supra*, 435 U.S. at 599, 98 S.Ct. at 1312; *Hubbard, supra*, 650 F.2d at 316; *Mitchell, supra*, 551 F.2d at 1260.

17. *Nixon, supra*, 435 U.S. at 599, 98 S.Ct. at 1312.

18. *Id.* at 602, 98 S.Ct. at 1314.

19. *Mitchell, supra*, 551 F.2d at 1260.

20. *Hubbard, supra*, 650 F.2d at 317 n.89.

21. *See Nixon, supra*, 435 U.S. at 602, 98 S.Ct. at 1314; *Hubbard, supra*, 650 F.2d at 317; *see also Mitchell, supra*, 551 F.2d at 1262 (access should be denied only when those who object to the exercise of the common law right to inspect and copy judicial records have "sustained [their] burden of demonstrating that justice required denying access to the court records.").

22. *Mitchell, supra*, 551 F.2d at 1260.

23. *Id.* at 1261.

24. *Id.* at 1260; *see Hubbard, supra*.

*United States v. Mitchell*[25] and the Second Circuit's decision in *United States v. Myers*.[26] The broadcasters contend that *Myers* is particularly persuasive here, since *Myers* approved an order allowing the broadcasters to copy the video tapes introduced into evidence in the ABSCAM trial of Congressman Myers on the same day that they were played to the jury. Appellee Jenrette maintains that the district court simply cannot be said to have abused its discretion under the circumstances of this case. We find ourselves in essential agreement with the broadcasters.

The only consideration given by our district court to the interests favoring the application was its recognition that the public has a legitimate interest in learning of the conduct of its elected officials.[27] But in recognizing this interest, the court also found, in essence, that it had been served by the fact that the trial had been widely publicized and had been open to the public and the press. We think this analysis gives short shrift to the many factors favoring release of the tapes at issue here.

First, the fact that the tapes were admitted into evidence and played to the jury weighs heavily in favor of the application. As we have previously observed, "the general rule is that '[a] trial is a public event,' and '[w]hat transpires in the court room is public property.' "[28] Second, the tapes had been seen and heard by those members of the press and public who attended the trial. Our cases have recognized that such previous access is a factor which lends support to subsequent access.[29] Third, the tapes contain only admissible evidence, were introduced for the purpose of proving the guilt of the defendants, and were obviously relied upon by the jury in finding the defendants guilty of the offenses charged. Thus, releasing the tapes will promote the integrity of the judicial process, for such will open at least part of the proceedings to those members of the public who could not attend the trial and will thereby enable them, to some degree, to consider for themselves the merits of the jury's verdict,[30] and the validity of the investigation that produced the evidence. Fourth, the nature of the trial itself is a factor which provides strong support for the application. As noted above, this case involves issues of major public importance—a high government official has been charged with, and convicted of, betraying the public trust, and law enforcement agencies have been accused of employing tactics which subvert the constitutional rights of the citizenry. Thus, although the public's First Amendment right of access to the trial itself was fully respected in this case,[31] and although the case was reported by the press and broadcast media, we believe that following the trial "there remains a legitimate and important interest in affording members of the public their own opportunity to see and hear evidence that records the activities of a Member of Congress ... as well as agents of the Federal Bureau of Investigation."[32] Finally, the tapes sought are fully encompassed by the presumption in favor of access to judicial records. In sum, we conclude that the instant facts present a strong case for recognizing the common law right to inspect and copy judicial records.

In denying the broadcasters' application the court relied primarily upon the defend-

---

**25.** *United States v. Mitchell*, 551 F.2d 1252 (D.C.Cir.1976), *rev'd on other grounds sub nom. Nixon v. Warner Communications Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978).

**26.** *United States v. Myers*, 635 F.2d 945 (2d Cir. 1980).

**27.** *In re Application of National Broadcasting Co. Inc.*, *supra*, 635 F.2d at 951; App. at 127.

**28.** *Mitchell, supra*, 551 F.2d at 1261, *quoting Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947).

**29.** *Mitchell, supra*, 551 F.2d at 1260–61; *see Hubbard, supra*, 650 F.2d at 318.

**30.** *Compare Hubbard, supra*, at 321.

**31.** *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).

**32.** *Myers, supra*, 635 F.2d at 952.

ants' interest in securing a fair and impartial jury should their cases be retried. The court noted that several defense motions were pending before it which the court characterized as "not frivolous".[33] If new trials were granted, the court stated, release of the tapes would jeopardize the defendants' rights because (1) the broadcasters probably would play portions of the tapes at or near the beginning of any retrial, accompanied by references to the prior verdicts and the court's rulings on the defendants' motions and (2) the broadcasters probably would not play the tapes in their entirety, due to time restrictions, but would air only selected portions of the tapes in a manner presenting the defendants in the most unfavorable light.[34]

Protecting the rights of Jenrette and Stowe in the event of new trials is a perfectly valid consideration, but our decision in *Mitchell* makes it clear that restricting the common law right to inspect and copy judicial records is rarely the proper protection.

In *Mitchell*, following the conclusion of the Watergate conspiracy trial, the district court refused to allow several television stations and a large manufacturer of phonograph records to copy the audio tapes which had been introduced into evidence and played to the jury in that case. The court stated that it was "unwilling to 'take any action which carries the risk of causing possible prejudice'" to the convicted defendants should their convictions be reversed on appeal.[35] We held that the trial court abused its discretion in refusing to release the tapes merely to avoid the risk of causing possible prejudice at a *"hypothetical"* second trial.[36] First, we doubted whether the risk of potential prejudice at a hypothetical second trial could ever justify infringing upon the common law right of access to judicial records. We noted that this argument, taken to its logical conclusion, could result in the tapes never being released since any conviction is always subject to the possibility of successful collateral attack.[37] More importantly, however, we found that the risk of prejudice was not

33. *In re Application of National Broadcasting Co. Inc., supra*, slip op. at 8; App. at 124. These motions included the defendants' motions to dismiss the indictment based upon alleged governmental violations of "fundamental fairness" and due process, the defendants' motions for judgment of acquittal, and Stowe's motion for a new trial based upon the court's refusal to sever his case from Jenrette's. *Id.* The court also noted that Jenrette intended to file a motion for a new trial. *Id.* Jenrette has informed us that he has indeed done so, alleging certain "procedural errors in the conduct of the trial, including the admission of certain testimony and the refusal of the trial Court to give a defense requested instruction on coercion." Brief of Appellee John W. Jenrette at 14.

34. *In re Application of National Broadcasting Co. Inc., supra*, slip op. at 9; App. at 125. The court also stated that any second jury might have to be sequestered, if the tapes were released, since portions of the tapes may be shown in such a way as to make a fair trial impossible, and since some of the tapes played to the first jury might not be shown to the second. *Id.* at 9–10; App. at 125–26.

35. *Mitchell, supra*, 551 F.2d at 1261.

36. *Id.* (emphasis in original).

The applicants in *Mitchell* filed their first formal application to copy the tapes during the Watergate trial itself. Because the demands of the trial were too great for him to pass upon the application, Judge Sirica referred the matter to Judge Gesell, who granted the application. Anticipated administrative and mechanical difficulties, however, led Judge Gesell to order that the tapes not be copied until the trial, which was in its final stages, had concluded. He also directed the parties to submit proposals concerning the manner in which the tapes should be duplicated. Judge Gesell rejected the initial proposal submitted. By this time, however, the trial had ended and the matter was referred back to Judge Sirica, who ruled that the tapes should not be released at that time. *See Mitchell, supra*, 551 F.2d at 1256–57. On appeal, we held not only that Judge Sirica abused his discretion in refusing to release the tapes, *id.* at 1261–63, but also that Judge Gesell acted within the scope of his discretion in granting the original application, despite the arguments raised by former President Nixon that disclosure would contravene the confidentiality of presidential conversations and would invade the privacy of those, including himself, whose voices appeared on the tapes, *id.* at 1263–65.

37. *Id.* at 1262.

sufficiently grave in that case to justify the district court's action. The tapes at issue contained only admissible evidence, and not "an inadmissible confession, a list of prior convictions or other prejudicial evidence that, although part of the court's records, was kept from the jury".[38] We also considered it unlikely that listening to the tapes prior to any retrial would "render every listener incapable of 'lay[ing] aside his impression or opinion and render[ing] a verdict based on the evidence presented in court.'"[39] We found support for this conclusion in the conduct of the parties at the trial, noting that neither the defendants nor the government had objected to the release of the tapes at the time the district court issued its opinion.[40]

We think *Mitchell* is fully applicable here. Although the trial court characterized the motions filed by Jenrette and Stowe as "nonfrivolous", the prospect of a retrial remains speculative. We accordingly still remain wary of sanctioning denial of a post-trial application to copy and inspect judicial records based on the pendency of new trial requests that may ultimately be denied, although they cannot be dismissed at the threshold as frivolous. This is not a case where the court has indicated it is inclined to grant a new trial.

Furthermore, should the presently hypothetical second trial become a reality, we find nothing in the record to indicate that there would be significant difficulty in assembling a panel of the "impartial, 'indifferent' jurors" to which the defendants would be constitutionally entitled.[41] We agree that broadcasting the video and audio tapes might increase the percentage of the potential venire which possesses some knowledge of the facts and issues, and even the evidence, involved in the case. We also acknowledge that the tapes may be broadcast in a manner which does not give "equal time" to the portions Jenrette contends support his claim of innocence. We also think it likely, however, that a significant percentage of the potential jury pool will not see or hear the tapes, or if they do, will quickly forget much of what they saw. In the words of the Second Circuit, we think there is somewhat of a tendency to "frequently overestimate the extent of the public's awareness of news".[42]

As to those potential jurors who do see and hear the tapes, and upon whom they make a more substantial impression, we doubt, as we did in *Mitchell*, whether such exposure will render it impossible to secure a qualified jury. As in *Mitchell*, the tapes at issue here contain only admissible evidence and were played to the first jury. As in *Mitchell*, we have no record basis for believing the same tapes will not be played in their entirety to any second jury. Thus, broadcasting the tapes will not expose those potential jurors who see or hear them to any legally prejudicial evidence which, as jurors in the second trial, they would be barred from viewing or considering in reaching a verdict. Furthermore, we have no reason to believe that the broadcasting of the tapes will be so prolonged or so intensive that it would create more prejudice than the unequalled media publicity which preceded the Watergate trials and which this court en banc held did not deny a fair trial.[43]

---

**38.** *Id.*

**39.** *Id.,* quoting *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–1643, 6 L.Ed.2d 751 (1961).

**40.** *Id.* at 1262–63.

**41.** *See Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *United States v. Haldeman,* 559 F.2d 31, 60–63, 70–71 (D.C.Cir.1976) (en banc), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

**42.** *Myers, supra,* 635 F.2d at 953.

**43.** *Haldeman, supra,* 559 F.2d at 70–71. We also note the experience of Judge Pratt, the district judge in Brooklyn who granted the broadcasters' application in the *Myers* case. Shortly thereafter Judge Pratt presided over the ABSCAM trial of Congressman Frank Thompson, Jr., which commenced after the tapes from the *Myers'* trial had been released. The judge commented that, as he had suspected, he was able to obtain an impartial jury, notwithstanding the release of the tapes. App. at 113.

Finally, to the extent that some members of the potential jury pool are so affected by the broadcasting of the tapes that they are unqualified to sit under these standards, voir dire has long been recognized as an effective method of rooting out such bias,[44] especially when conducted in a careful and thoroughgoing manner.[45] Chief Justice Burger discusses other therapeutic measures in *Nebraska Press Ass'n v. Stuart.*[46]

Appellee Jenrette nevertheless argues that the likelihood of prejudice in this case is extremely great. Jenrette points out that this case differs from *Mitchell* since neither the government nor the defendants there objected to release of the tapes at issue, while here he objects to their release. He also contends *Myers* is inapplicable because it is factually distinguishable on a number of grounds. According to Jenrette, these factors, some of which were relied upon by the district court, compel the conclusion that the district court properly denied the broadcasters' application.

We disagree. *Mitchell* by no means held that "prejudice exists when a party objects, and does not if one does not". Rather, *Mitchell* simply recognized that the conduct of the parties to the trial is evidence which may be considered in determining whether there exists a truly significant risk of prejudice. And the parties' conduct in this case lends support to our conclusion that the risk is this case does not warrant denial of the broadcasters' post-trial application, for of the three parties involved, neither Stowe, whose rights in the event of a retrial are at stake,[47] nor the government, object to releasing the tapes. Thus, we remain of the view that this case is fairly covered by the holding in *Mitchell.*

We also find the distinctions drawn between this case and *Myers* to be inaccurate or unpersuasive. Jenrette contends that *Myers* does not support the broadcasters' application because Congressman Myers does not face the possibility of a retrial. Jenrette contrasts this with his case, in which motions for retrials are outstanding.

We also note that existing studies, while not conclusive, support the view that pretrial publicity does not affect jurors to the degree some believe. One commentator, after reviewing the existing data, concluded:

experiments to date indicate that for the most part juries are able and willing to put aside extraneous information and base their decisions on the evidence. The results show that when ordinary citizens become jurors, they assume a special role in which they apply different standards of proof, more vigorous reasoning, and greater detachment.

Simon, *Does the Court's Decision in* Nebraska Press Association *Fit the Research Evidence on the Impact on Jurors of News Coverage?*, 29 Stan.L.Rev. 515, 528 (1978).

**44.** *See United States v. Burr*, 25 Fed.Cas. 49, 51 (Cas. No. 14,692) (1807) (Marshall, C. J.).

**45.** *See e. g. Haldeman, supra*, 559 F.2d at 64–71; *Calley v. Callaway*, 519 F.2d 184, 203–212 (5th Cir. 1975) (en banc), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976); *Margoles v. United States*, 407 F.2d 727, 730 (7th Cir.) *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). In the event voir dire reveals insurmountable prejudice, of course, additional measures exist, such as the granting of a continuance or a change of venue, to protect the rights of the defendants. Jenrette argues that "[i]n light of the pervasive influence of the media, a change of venue may accomplish so

little insulation as to prove useless", Brief of Appellee John W. Jenrette at 19. We admit that airing the tapes may make selection of a jury more difficult, but we also "do not believe the public at large must be sanitized as if they all would become jurors", *Myers, supra*, 635 F.2d at 953. And although Jenrette also contends that "the spector [sic] of a contaminated jury sitting in judgment of appellee's civil charge of unlawful government conduct is . . . a judicial certainty", Brief of Appellee John W. Jenrette at 15, an intensive and thoroughly conducted voir dire should ensure that the jurors selected for the civil case also have not been tainted by pretrial publicity.

**46.** *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 563–65, 96 S.Ct. 2791, 2804–2805, 49 L.Ed.2d 683 (1978).

**47.** Jenrette urges us to discount Stowe's failure to object on the grounds that Stowe does not face the possibility of a second trial. Jenrette argues that since Stowe did not dispute any of the elements of the offenses charged, relying on a pure entrapment defense, any appellate reversal of Stowe's conviction will not result in a retrial. This argument ignores Stowe's still undecided motion for a new trial based upon the district court's denial of his motions to sever.

This purported distinction, however, lends little support to Jenrette's cause. For although *Myers* does not address the effect of releasing the tapes on any potential retrial of Myers, it does address the effect of releasing the tapes on subsequent trials of Myers' three co-defendants which were scheduled to occur, if the defendants did not plead.

At the time the trial court granted the broadcasters' application, three defendants indicted and tried along with Congressman Myers faced future ABSCAM trials on indictments unrelated to the charges brought in *Myers*. These three defendants argued to the Second Circuit that releasing the tapes would have a prejudicial effect on their ability to secure fair and impartial juries in these subsequent trials. The Second Circuit nevertheless affirmed the trial court's order, specifically rejecting the argument that broadcasting the *Myers'* tapes "pose[d] the kind of risk to fair trials ... that justifies curtailing the public's right of access to courtroom evidence." [48] Thus, given that future trials were almost certain to occur in *Myers*, while here they remain a mere possibility, the *Myers* decision not only fails to support Jenrette's argument but actually weighs against it. [49]

Jenrette also attempts to distinguish *Myers* on the grounds that Congressman Myers did not assert the defense of entrapment, as did he, and entrapment is a difficult concept for laymen to understand. The significance of this distinction apparently lies in the assumption that the concept will be even more bewildering to laymen after they have seen the tapes at issue here. Another purported distinction between the cases is that the population of New York is less "sensitive" to, and less interested in, news concerning the activities of persons in the federal government than the citizens of the District of Columbia. We do not find these arguments persuasive. Acknowledging that Myers did not assert the defense of entrapment, and even engaging in the somewhat dubious assumption that the population of the District of Columbia would be affected to a greater degree than the population of New York by viewing and hearing the tapes, the fact remains that any retrial of Jenrette or Stowe at this stage is speculative. And assuming that the hypothetical retrials become realities, we remain convinced that the trial court possesses sufficient means to combat any threats to the rights of the defendants. [50]

We thus adhere to our holding in *Mitchell* that the interest in avoiding the risk of potential prejudice at a *hypothetical* second trial is seldom of sufficient weight to justify denying access to judicial records which have been displayed in open court. We also conclude that there has been no showing in this case that the risk of prejudice is so grave that it outweighs the interests favoring release of the tapes.

Another factor the district court found to weigh in favor of denying the broadcasters' application was that it seemed "unfair" to the defendants to release the tapes when the court had yet to rule on their nonfrivolous motions to dismiss the indictment for lack of fundamental fairness and due process. [51] Noting that Jenrette claimed to have been "targeted by political enemies", the court considered that the defendants should have the opportunity to make further arguments concerning the release of the tapes if the evidence bore out Jenrette's contention. [52] The court stated that, if Jenrette's claim were true, it could be argued that "release of the tapes would be used to gratify a private spite". [53]

Appellee Jenrette urges that the district court acted altogether properly. He points

**48.** *Myers, supra*, 635 F.2d at 953.

**49.** In addition, there is no support for the contention that defendant Myers might not secure a retrial of his case. If Myers successfully appeals his conviction, a retrial may follow.

**50.** *See* p. 617 *supra*.

**51.** *In re Application of National Broadcasting Co., Inc., supra*, slip op. at 10; App. at 126.

**52.** *Id.*

**53.** *Id.*

out that although the court has yet to rule on these motions, it has held two sets of hearings thereon, and has ordered a significant amount of post-trial discovery into the government's conduct, including the production of 25 volumes of ABSCAM related material for its own *in camera* review. These developments, it is urged, further demonstrate the nonfrivolous nature of the motions.

The pendency of the fundamental fairness and due process motions, in our opinion, does not outweigh the broadcasters' right to inspect and copy the tapes. These motions, as we understand them, assert that the indictment should be dismissed because of governmental misconduct, regardless of what the defendants may have done—that is, regardless of whether the actions of the defendants would otherwise amount to prosecutable crimes. These motions apparently do not challenge the integrity of the tapes—for example, that they have been doctored in any fashion—nor do they contend the conduct and statements recorded thereon did not occur or were inaccurately recorded. Furthermore, the tapes have already been seen and heard by the jury and those members of the press and public who attended the trial, and the media coverage thereof has made their contents known to some degree to the public. Under these circumstances, while the media may in a sense be flogging a dead horse, we see no "unfairness" in permitting the public at large to see and hear now what has already been publicly viewed and heard in court, what the defendants do not claim did not occur, and what the jury evidently considered to be weighty evidence of criminal misconduct.[54] And, under these circumstances, Jenrette's concern for his reputation and any embarrassment which may

flow from the additional disclosure of the tapes is entitled to little weight, for "the embarrassment ... anticipate[d] is largely that which results whenever misconduct or questionable conduct is exposed."[55] Any "unfairness" to Jenrette which may result from the release of the tapes will be sufficiently countered by the publicity which will surely accompany any dismissal of the indictment, if that should occur. The nature and the extent of the government's misconduct will undoubtedly be as newsworthy as the criminal activities in which the jury found both Jenrette and Stowe to have engaged.

The district court also grounded its denial of access on the possible injury and invasion of privacy which might be inflicted upon innocent third persons who were referred to on the tapes by either the defendants or the FBI operatives, and who were sometimes held up to public ridicule. The court cited as one example of this potential harm an unsupported remark on a portion of the tapes that another member of Congress was susceptible to taking a bribe.

■ Possible injury to innocent third persons is certainly a factor that may properly be taken into account by the district courts in passing upon applications to copy and inspect judicial records.[56] For example, in *In Re Application of KSTP Television For Video Tapes in the Case of United States of America v. Ming Sen Shiue*,[57] a television station callously sought to copy and televise three hours of color videotape that had been introduced into evidence and played to the jury in the federal kidnapping trial of defendant Shiue. Shiue, an electronics expert, had kidnapped and repeatedly raped a woman, who was a church missionary worker and the wife of a clergyman, and had

---

**54.** *See Myers, supra,* 635 F.2d at 952.

**55.** *Mitchell, supra,* 551 F.2d at 1263–64. We note that Jenrette has made no claim that releasing the tapes will cause him the type of embarrassment which we have recognized might be worthy of protection, such as that flowing from "republication of highly personal matters", for example, "recordings of bedroom or other intimate conversations". *Id.* at 1263.

**56.** *See Hubbard, supra,* 650 F.2d at 323–324.

**57.** *In re Application of KSTP Television For Video Tapes in the Case of United States of America v. Ming Sen Shiue,* 504 F.Supp. 360 (D.Minn.1980).

videotaped the entire nine hour ordeal. The court received into evidence only those tapes which recorded the conversations and conduct which occurred preliminary to the actual rapes. These tapes showed the blindfolded victim lying on a blanket on the floor, with her hands and feet bound. The victim, the government, and the defendant all objected to the release of the tapes.

After reviewing the decisions in *Mitchell, Nixon,* and *Myers,* Judge Devitt denied the application. He reasoned that releasing the tapes would not advance the public interest, as would the airing of alleged criminal conduct of high public officials in the Watergate and ABSCAM cases, but would rather serve the improper purpose of supporting sensationalism and pandering to prurient interests.[58] And in the strongest of language, he refused to release the tapes when to do so would "expose [the victim] to public humiliation and degradation[,] . . . would . . . be unseemly and shameless[,] . . . [and] would constitute an unconscionable invasion of privacy."[59]

We agree fully with Judge Devitt's decision, and admit that we find the interest in avoiding injury to innocent third persons to be the most significant interest identified by the district court which weighs against the broadcasters' application. However, out of all the material contained in the tapes played to the jury, the district court identified only one objectionable remark. This indicates to us that the overwhelming majority of the recordings sought pose no threat of such harm. We also note that none of the innocent third persons involved, including the aforementioned member of Congress, objected in any manner to the broadcasters' application, either in the district court or in this court. Possibly they were unaware of the reference. We are nevertheless mindful of the harm to innocent third persons which could flow from public dissemination of libelous or other harmful material contained in the tapes. Accordingly, we direct the district court on remand to order the deletion of the reference to the member of Congress and to receive any objections which innocent third persons mentioned on the tapes might make to release of those portions of the tapes which contain objectionable material. Such objections should be considered in light of the principles set forth in this opinion. If the objections are found to be meritorious, the district court may sanitize the objectionable portions of the tapes to remove the offending remarks or order that the identity of the innocent third person be deleted.[60]

## IV.

In summary, we conclude that the district court abused its discretion when it denied the broadcasters' post-trial application to inspect and copy the video and audio tapes introduced into evidence and played to the jury in the criminal trial of Jenrette and Stowe.[61] As noted above, the trial raised

---

**58.** *In re Application of KSTP, supra,* at 363.

**59.** *Id.* at 363.

**60.** Jenrette also argues that release of the tapes would violate the due process clause of the Constitution. This conclusion flows, he argues, from the Supreme Court's alleged holding in *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) that the televising of a trial itself constitutes a violation of due process, and from the fact that the tapes sought here constitute the "bulk" of the government's case. Thus, broadcasting the tapes amounts to an impermissible broadcasting of the trial itself. Brief of Appellee John W. Jenrette at 17. To reject this argument, we need only note the Supreme Court's recent holding (and clarification of *Estes*) that the act of televising a trial does not amount to a per se violation of due process. *Chandler v. Florida,* 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981).

**61.** At oral argument, counsel for Jenrette indicated that some of the tapes which had been introduced into evidence had not been played to the jury. If this is so, these tapes were not within the scope of the broadcasters' application, which specifically requested permission to copy only "the video and audio tapes that were admitted into evidence and played to the jury in open court". App. at 39. The district court's opinion was accordingly limited to ruling upon the tapes requested by the broadcasters, *In re Application of National Broadcasting Co. Inc., supra,* 435 F.2d at 947, and the broadcasters' notice of appeal raises only the issue of whether the district court erred in refusing to release the requested tapes, App. at 128. Thus, the question whether tapes which were not

issues of major public importance relating to the conduct not only of the defendants but also of government law enforcement agents. The interests supporting the broadcasters' application, including the presumption of access, weigh heavily in favor of releasing the tapes. The countervailing interests, except as to innocent third persons, whether considered in isolation or in combination, are insufficient, in our opinion, to justify shielding the tapes from public scrutiny. Accordingly, the order of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Judgment accordingly.*

played to the jury should be released, if sought, is not before us, and we express no opinion thereon. Our decision does not require the release of such tapes. We note only that substantially different considerations may come into play when the records sought have not previously been made public. *See Hubbard, supra.*