General William C. WESTMORELAND, Plaintiff,

v.

CBS, INC., et al., Defendants.

Misc. Nos. 82–0298, 83–0313 and 84–0067.

United States District Court, District of Columbia.

April 19, 1984.

On Motion for Reconsideration May 14, 1984.

See also, D.C., 97 F.R.D. 703.

Kathleen A. McGinn, Washington, D.C., for Westmoreland.

John G. Kester, Williams & Connolly, Washington, D.C., for Helms.

David Boies, New York City, for CBS.

William H. Briggs, Jr., Asst. U.S. Atty., Washington, D.C., Stanley F. Echols, Spec. Asst. U.S. Atty., for CIA.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Three matters are now before this Court, on motions assignment, relating to discovery sought in the District of Columbia of non-parties to an action for defamation now pending in the U.S. District Court for the Southern District of New York.[1] The Central Intelligence Agency ("CIA") has moved for a Rule 26(c) protective order against its production, pursuant to Gen. Westmoreland's subpoena, of documents generated by the CIA's Office of·the Inspector General and the CIA Review Board (the "Report") in the course of an investigation of alleged intelligence failures in Vietnam in the 1960's. The CIA also asks for a similar order with respect to a "draft history" of Richard M. Helms' tenure as its Director from June, 1966, through February, 1973, subpoenaed by CBS. The final motion, filed by CBS, seeks an order to show cause why Richard M. Helms should not be held in civil contempt for failing to submit to the video-taping of his pretrial deposition upon oral examination by CBS.

*The Inspector General's Report*

Westmoreland's subpoena to the CIA, in which CBS has joined, commands the CIA to produce, in effect, the file compiled by its Inspector General and the CIA Review Board in considering charges of miscalculations of enemy troop strength in Vietnam. The CIA responds that it has, over the past months (and at substantial public expense), provided the parties *gratis* with declassified portions of multiple other documents they have requested—600 of them in all, numbering some 6,000 pages—"leading up to the beginning of the investigation con-

---

**1.** In that action plaintiff General William C. Westmoreland alleges that defendants CBS and others libelled him in a January 23, 1982, telecast by CBS News entitled "The Uncounted Enemy: A Vietnam Deception." Much of the discovery is taking place in the District of Columbia where both plaintiff and defendants have sought information via the Freedom of Information Act and subpoenas *duces tecum,* issued on the court's Miscellaneous Docket, to numerous government agencies, including the Central Intelligence Agency. All such ancillary proceedings have been consolidated as "related matters" before this Court.

ducted by the Office of the Inspector General." Its motion for a protective order asks the Court to prohibit discovery of only the Inspector General's 1968 Report itself and the supporting data, and documents reflecting its subsequent consideration or identities of persons who provided information found in the Report.[2]

The CIA contends the documents are undiscoverable, because they are "privileged," *see* Fed.R.Civ.P. 26(b)(1), invoking the "executive privilege" which it interprets as being inclusive of several subordinate governmental privileges, among them the "deliberative process privilege." *See Black v. Sheraton Corp. of America,* 564 F.2d 531, 541–42 (D.C.Cir.1977). The Director also asserts his mandate under the National Security Act to protect information which would reveal or disclose intelligence sources and methods, 50 U.S.C. § 403(d)(3), or the organization, functions, names and titles of CIA employees, 50 U.S.C. § 403g, and he reserves the right, should his reliance upon lesser grounds fail, to claim a "state secrets privilege" for some of the documents which he believes must properly be treated as such.

The CIA's primary concern is with the protection of the integrity of its Inspector General's investigatory process. It insists that the privilege is necessary to assure that the Inspector General receives accurate and complete responses to his inquiries, and that the Director be given the Inspector General's candid, even critical, conclusions drawn from them, to enable

him to fulfill his own important national security responsibilities.

The CIA supports its application for a protective order with the affidavit of its Director, William J. Casey, who avers that his statements are made on personal knowledge, derived from information obtained by him in the course of his exercise of his official responsibilities. As to Inspector General's reports generally, he says, the staff of the Inspector General "is allowed access to *any* information within the CIA . . . ." Casey Aff. at 3. (emphasis supplied). Since the relevant provisions of the National Security Act of 1947, 50 U.S.C. §§ 403 *et seq.*, expressly provide that the CIA shall "have no police, subpoena, law enforcement powers, or internal security functions," 50 U.S.C. § 403(d)(3), the Inspector General may obtain only unsworn voluntary statements from those of whom it makes inquiry, which are, therefore, elicited under a promise of confidentiality. Factual information so acquired is then included in the Inspector General's report to the Director concerning the effectiveness of the agency's programs or the results of any problem areas it is called upon to investigate. The report contains recommendations for the Director's guidance, is regarded by him as a "management tool," and is never made public or published in any form. In conclusion, the Director says:

"... I believe it is absolutely necessary to the CIA's mission of gathering, evaluating and correlating the most accurate foreign intelligence that any investiga-

---

**2.** The general categories of the documents sought are:

1) The Inspector General's Report itself and attachments;

2) Interview notes, question-and-answer sheets, and memoranda prepared by the Inspector General's staff pertaining to the interviews it conducted;

3) Correspondence, status reports, and notes created by the Inspector General's office relating to the manner in which the investigation should be conducted or summarizing the progress being made;

4) The complaint of one Sam Adams, then a CIA employee, and correspondence between Adams and members of the Office of the In-

spector General relating to Adams' charges of an intelligence failure in Vietnam and the processing of his complaint;

5) (a) The CIA Review Board's report and attachments;

   (b) Correspondence and memoranda of conversations generated in connection with the Review Board's review of the Inspector General's Report; and

6) Correspondence, memoranda, and reports generated by and between the Office of the Inspector General and the President's Foreign Intelligence Advisory Board ("PFIAB") concerning their deliberations as to whether Adams' charges were worthy of PFIAB attention.

tion conducted by the CIA's office of Inspector General relating to ... upgrading or correcting the aforesaid intelligence activities not be made public. To do so, in my estimation, would make it impossible in the future for the CIA's office of Inspector General to obtain candid and complete statements from persons interviewed and to supply me as Director ... with that Office's complete and frank expressions and suggestions concerning the matter."

Casey Aff. at 11.

Westmoreland and CBS concede that the Inspector General's Report has an aura of the "deliberative process" about it, but they argue that such privilege as it may enjoy is not absolute and can be overcome by their showing of need for it. CBS acknowledges that it may be difficult for it to make the required showing; General Westmoreland, for his part, contends that Mr. Casey's affidavit is too conclusory to support the claim of privilege, and that the Report is crucial to his case. He also contends that, the material not having heretofore been kept confidential, any privilege has been waived.[3]

■ Westmoreland's need for the Report (if it supports him) may be more acute than CBS', since he must prove at trial not only that he did not dissemble as CBS' broadcast suggested, but that CBS knew or ought to have known it at the time. Even so, it is not central to his case in the sense that his case must inevitably fail without it. Whatever its contents, it can do no more

than corroborate him (assuming it is admissible at all), for it did not exist at the time he was accused of having been deceitful, and it was not a source upon which CBS relied in charging that he was.

The volume of CIA material already given the parties (and the effort expended in producing it) should allay most misgivings about the ingenuousness of the CIA's reasons for withholding the Report or suspicions that it may be doing so from indolence or caprice. Regardless of whether there could ever be a showing of need sufficient to overcome the privilege, neither CBS nor General Westmoreland has shown such a need for the Report as to transcend the CIA's need to keep the proceedings of its Inspector General to itself.

The Report may contain military secrets, *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), or the deliberations of high executive officials, *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Even if its contents is innocuous from the standpoint of national security, however, the Director himself fears that its disclosure "might impair the necessary functioning of a department of the executive branch," and considerable deference should be given "the formal claim of privilege asserted by one of the highest officers of the government." *Black v. Sheraton Corp. of America*, 564 F.2d 531, 542 (D.C.Cir.1977). *See McGehee v. CIA*, 697 F.2d 1095, 1112 (D.C.Cir.1983); *Hayden v. NSA*, 608 F.2d 1381, 1387 (D.C. Cir.1979), *cert. denied*, 446 U.S. 937, 100

---

3. Westmoreland says that Sam Adams, the former CIA agent whose complaint in May, 1968, precipitated the Inspector General's investigation, was allowed to review the Inspector General Report while he was still with the CIA. Adams later wrote a book, soon to be published, which includes the names of some of the individuals who participated in the Inspector General's investigation and the subsequent preparation of the Report and the CIA has cleared Adams' book for publication. Since the information has already escaped the confines of the CIA with its acquiesence, Westmoreland argues, both the reason for and right to claim a privilege for it now have evaporated.

The facts, however, do not support the argument for waiver. It seems that Adams reviewed

only 14 pages of the Inspector General's report—he neither copied nor took notes on them—while he was, and in his capacity as, an employee of the CIA, and the pages he saw did not include the comments of persons who gave evidence. Adams' book has been cleared by the CIA, because it is limited to excising only classified information from the publications of its erstwhile employees. *See U.S. v. Marchetti*, 466 F.2d 1309 (4th Cir.1972), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972). General Westmoreland has already obtained a copy of the unpublished book through discovery and, thus, has access to at least some of the information he wants, although names of covert agents have been deleted.

S.Ct. 2156, 64 L.Ed.2d 790 (1980). As an earlier case in this court recognized, the executive privilege may exist apart from the familiar military/state secrets genre. "[I]t is well-established that the privilege obtains with respect to intra-governmental documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 324 (D.D.C. 1966), *affirmed,* 384 F.2d 979 (1967), *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967).

The Court concludes that it is unnecessary to parse the concept of "executive privilege" as it applies to the Inspector General's Report, for the Report partakes of the nature of several of the categories of non-discoverable governmental documents it encompasses, and the privilege will be sustained as invoked.

### The Draft History

■ CBS has also served the CIA with a subpoena *duces tecum* requiring production of portions of a document the CIA refers to simply as a "draft CIA report." That report, being prepared by one R. Jack Smith, a former CIA Deputy Director for Intelligence now under contract to the CIA, appears from its description to be essentially a history of Richard M. Helms' years as CIA Director.

The CIA explains that the history is being written at the express direction of the Director to assist him and his successors in learning from the experience of a predecessor. The CIA does not intend to make it public, will classify it as "top secret" when finished, and claims the same privilege for it as for the Inspector General's Report. It also believes the draft history should be withheld for the simple reason that it is a draft only and, as such, does not and cannot reflect an official agency position with respect to the events of the Vietnam era.

In his affidavit in support of the CIA's motion to preclude discovery of the history Casey states:

"Since this is the initial draft of the Report there will be numerous readings of the Report to check it for accuracy and for content. I fully expect that after further deliberations have taken place, changes will be made in the draft which will change statements in the Report of the Helms' years from their present form. Persons in the deliberative review process will be less inclined to candidly air their own views, especially if they are counter to the views of others, if the possibility exists that they may later be held accountable for such alternative views at some future time. Therefore, it would be harmful to this Agency and make it very difficult for senior management to carry out their functions, if Reports of this kind, especially in their raw unfinished versions, were subject to discovery and utilized in litigation or otherwise."

Casey Aff. at 3.

CBS argues that a history is, by definition, a record of the past, and, hence, cannot compromise the decision-making process of the present. If the history contains the names of agents, it can be redacted. That it is in draft form, it says, goes only to its weight and not its utility as a source of information. CBS says it has been told that a number of the other documents it wanted, such as notes and minutes of meetings, have been destroyed or misplaced by the CIA, and it postulates that the draft history may contain the substance of some or all of them. CBS protests that former CIA Director Helms has submitted an affidavit at Gen. Westmoreland's behest which relates the events of the period in a manner which advances Westmoreland's case, and since the contemporaneous documents seem to be missing, CBS will need the draft history to test Helms' version. All that conceded, however, the fact remains that the draft history is of value only for enlightenment; it is neither original evidence nor admissible otherwise in its present form.

In *Russell v. Dept. of the Air Force,* 682 F.2d 1045 (D.C.Cir.1982), the court of ap-

peals rejected the contention that an Air Force draft history of the use of the herbicide Agent Orange in Southeast Asia was outside the deliberative process, stating that the draft history was "pre-decisional," because "[t]he [official Air Force] report itself is the agency action or decision," and because the history was "clearly intended for future use in Air Force decisionmaking." *Id.* at 1049 n. 1. To disclose the draft version, it held, "would reveal the Air Force's deliberative process in creating" it. *Id.* at 1049.[4] *See also Jordan v. United States Dept. of Justice,* 591 F.2d 753, 772–73 (D.C.Cir.1978).

■ The Court concludes the CIA's draft history of the Helms era is similarly predecisional and covered by the deliberative process privilege for the same reasons. As a practical matter the status of the history as "final" or "draft" is academic, because the CIA states that the finished version will be classified "top secret," thereby making its eventual disclosure unlikely for some time. But CBS has asserted no need for it at present great enough to warrant even its submission for *in camera* review for the Court to determine if there are segregable parts. *See Center for Auto Safety v. EPA,* 731 F.2d 16, 24 (D.C.Cir. 1984).[5]

### The Videotape Deposition

CBS has petitioned for an order to require Ambassador Richard Helms to show cause why he should not be found in civil contempt for his refusal to submit to a Rule 30 pretrial deposition while CBS videotaped his testimony. Although he appeared in person for the deposition on February 22, 1984, pursuant to subpoena, Helms departed when defendants insisted on the videotaping.[6]

The Court concludes that Ambassador Helms' appearance for and declared willingness to commit his testimony to stenographic transcription was sufficient to satisfy the requirements of the routine Rule 45(d) deposition subpoena, dated February 3, 1984, which commanded him "to appear at the place, date, and time specified below to testify at the taking of a deposition . . . ." *See SEC v. Research Automation Corp.,* 521 F.2d 585 (2d Cir.1975). Accordingly, the Court will treat CBS's petition as a motion under Rule 30(b)(4) for an order allowing non-stenographic recording of the deposition.[7]

CBS now asserts (although it has previously given no indication of a *de bene esse* purpose) that it needs to videotape Ambassador Helms because he is 71 years of age, resides beyond the subpoena power of the trial court, has extensive travel plans (in-

---

**4.** In *Russell* the Air Force ultimately released the final version—it was not classified—and also released all but 20 pages of the draft, those being the pages eliminated from the finished product. The court conducted an *in camera* inspection of the 20 pages but determined they should not be released, because their removal constituted a decision by senior Air Force officials as to what material was appropriate for the history.

**5.** Both the CIA and CBS have indicated a willingness to have the Court review the draft history *in camera.* Where state secrets or matters of national security are involved, however, courts should be chary of subjecting material which the CIA claims will be classified "top secret" to even *in camera* review. *See EPA v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); *U.S. v. Reynolds,* 345 U.S. 1, 9–10, 73 S.Ct. 528, 532–33, 97 L.Ed. 727 (1953).

**6.** Both CBS and Helms pray for an award of costs incurred with respect to the deposition

and the petition, and Helms asks for an award of attorneys' fees under Rule 37, Rule 11, and 28 U.S.C. § 1927. Since both parties were aware in advance of the other's intransigence in the matter, yet went ahead to confrontation without first applying to the Court, and the attorneys' fees and costs would have been incurred had either proceeded by way of a prior application—CBS for a Rule 30(b)(4) order for videotaping (as the petition for a rule to show cause is hereafter treated), or Helms for a Rule 26(c) protective order—giving no cause for sanctions, the prayers for awards of fees and costs are denied.

**7.** The history of Fed.R.Civ.P. 30(b)(4) indicates that the initial burden is upon CBS to apply for an order in advance to record the deposition "by other than stenographic means," and not upon Helms to seek a protective order under Rule 30(d) against it.

cluding travel without the country), and declares that he will not promise to appear at trial voluntarily although he presently expects to do so.

Of the available alternatives to producing a live witness at trial, a videotape of the witness' deposition is doubtless the most likely to approximate what could be expected from his in-court testimony. It captures and preserves his appearance, vocal inflection, verbal emphasis, and demeanor as no other medium would, and if the law's only concern were with the quality of the evidentiary record, the issue would be relatively simple.

CBS contends that the District of Columbia Circuit has made the fidelity of the record to the witness' actual testimony the only gauge of the options permitted the parties under Rule 30(b)(4) in experimenting with alternatives to traditional stenographic transcription, correspondingly diminishing the discretion of the district judge confronted with a request to employ an alternative to ensuring "that the problems of accuracy and trustworthiness are adequately handled." *Colonial Times v. Gasch*, 509 F.2d 517, 521–22 (D.C.Cir.1975). The court said:

> [T]he judge may deny a movant's request under Rule 30(b)(4) only when he is convinced, after thorough examination of the movant's proposal and on the basis of the other party's specific objections and the judge's experience with the differing forms of deposition procedure, that the particulars of the request do not reason-

ably ensure accuracy equivalent to stenographic depositions.

*Id.* at 522.

*Colonial Times* was decided, however, in the context of mandamus proceedings collateral to an action against the Postal Service to compel it to accept an allegedly obscene newspaper for mailing. The court of appeals directed the district judge to give sympathetic consideration to the plaintiff's motion to take down the depositions of apparently amenable Postal Service employees by means of an aural tape recorder, the plaintiff wishing to dispense with a stenographer for reasons of economy. The court of appeals' rationale depended entirely on what it saw as the obstinacy of the district judge in refusing to entertain any alternatives at all to stenographic transcription except upon a showing of "manifest injustice." It had no occasion to consider whether the interests of reluctant witnesses would change the result.

█ The issue here, however, is whether a non-party witness of some public prominence (who is thus newsworthy) can or should be compelled to permit his image at a pretrial deposition to be visually preserved upon an essentially indestructible medium over which he exercises no right of control.[8] And it is clear that even in this circuit the concerns of such witnesses are both deserving of and entitled to some protection. Non-party witnesses, even public figures, have privacy rights under the First

---

8. The only reported case in which a non-party witness himself sought to prevent the videotaping of his pretrial deposition for personal reasons appears to be *In the Matter of Daniels,* 69 F.R.D. 579 (N.D.Ga.1975). Daniels had been the pilot of an Eastern Airlines plane which crashed on approach to the Charlotte, N.C. airport. Multiple lawsuits against the airline were consolidated for pretrial discovery in the U.S. District Court for the Western District of North Carolina which then granted the motion of plaintiffs' "trial committee" to videotape Daniels' deposition, subject to Daniels' right to object when the time came for him to be deposed in the district in which he lived. Daniels then moved for a protective order in the U.S. District Court for the Northern District of Georgia, contending that the presence of the camera would

likely "affect his concentration" and possibly the accuracy of his testimony, and his demeanor might therefore appear to the jury to be "false and unnatural." Plaintiffs countered that Daniels' testimony was "crucial," and that while he was saying he presently planned to appear voluntarily at trial, as a resident of Georgia he could not be compelled to attend should he change his mind. Balancing Daniels' transient discomfiture in being videotaped against the need of the multiple plaintiffs for a means of presenting his testimony to a jury in a way best calculated to allow his credibility to be tested, the court permitted the deposition to be videotaped but imposed conditions in the nature of camera directions and as to subsequent use of the tape.

and Fourth Amendments and under the Federal Rules. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); Fed.R. Civ.P. 26(c). *Compare United States v. Hubbard*, 650 F.2d 293 (D.C.Cir.1980); *In re Application of American Broadcasting Companies*, 537 F.Supp. 1168 (D.D.C.1982).

Helms does not object to being deposed; indeed, he has been most co-operative in scheduling his deposition and in producing the documents he was asked for. He simply does not want his deposition to be videotaped and is frankly apprehensive that CBS has an ulterior (or at least a collateral) motive for wanting to do so. Helms suspects that "CBS is videotaping not just for the court, but in order to accumulate potentially attractive broadcast material" for its archives[9] and intimates that CBS' litigation needs alone cannot explain why it is videotaping all the prominent former officials it is deposing.[10] CBS will not unequivocally promise it will never broadcast the tape, although it has no present plans to do so and declares itself willing to abide any appropriate conditioning order should one be entered. Even if the tape were placed under seal, however, Helms foresees an endless succession of attempts, not necessarily by CBS alone, to obtain access to it for purposes unrelated to the *Westmoreland* case and an attendant drain on his own vigilance, resolve, and resources in fending them off. *See, e.g., In re Application of National Broadcasting Co.*, 653 F.2d 609 (D.C.Cir.1981); *In re Application of American Broadcasting Companies*, 537 F.Supp. 1168 (D.D.C.1982); *In re Application of KSTP Television*, 504 F.Supp. 360 (D.Minn.1980). Finally, Helms submits that the spectacle of a former U.S. ambassador and Director of the CIA being interrogated, under oath, in the quasi-adversarial setting of a discovery deposition is both demeaning of him and inimical to the national interest, and could possibly expose him to personal risk, even if a way were found to guard against his inadvertent disclosure of classified information.

■ A court should deny a discovery request when its "purpose ... is to gather information for use in proceedings other than the pending suit ...." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353 n. 17, 98 S.Ct. 2380, 2390 n. 17, 57 L.Ed.2d 253 (1978), and this Court cannot now discern an exclusively case-oriented reason to find CBS' interest in videotaping Ambassador Helms' deposition sufficient to overcome his own well-founded objections to it. In *UAW v. National Caucus of Labor Committees*, 525 F.2d 323 (2nd Cir.1975), the U.S. Court of Appeals for the Second Circuit declined to issue a writ of mandamus in circumstances similar to those of *Colonial Times*, stating its opinion that *Colonial Times* "misconceives the scope of the district judge's discretion on Rule 30(b)(4) motions." 525 F.2d at 326. The Second Circuit does not restrict the district judge to a determination of the potential for accuracy of non-stenographic recording methods alone but accords him the usual "wide discretion" he enjoys in discovery matters generally. *Id.*

The Court concludes that, in the context of this case, the District of Columbia Circuit would not regard *Colonial Times* as controlling and would permit the district judge at least so much of his customary discretion as to allow the protection of a non-party witness against a "non-stenographic recording" of his deposition which is odious to him for reasons of substance.

It is, therefore, this 19th day of April, 1984,

---

**9.** The issue of whether the media can make such use of discovery material is pending before the United States Supreme Court in *Seattle Times Co. v. Rhinehart*, 52 U.S.L.W. (U.S. February 21, 1984); *see also id.* at 3104 (U.S. August 16, 1983).

**10.** CBS has already videotaped at least seven pretrial depositions and plans to videotape more. Among others whom CBS expects to videotape are former Secretary of State Dean Rusk, former Secretary of Defense Robert S. McNamara, and former CIA Director William E. Colby, all of whom have expressed anticipatory objections to it through counsel for General Westmoreland at hearing.

ORDERED, that the motions of the Central Intelligence Agency for protective orders are granted, and the subpoenas *duces tecum* of plaintiff Westmoreland and defendant CBS are quashed insofar as they purport to command production of the Inspector General's Report and the R. Jack Smith draft history, respectively; and it is

FURTHER ORDERED, that the motion of defendant CBS for an order to show cause, treated as a motion pursuant to Fed. R.Civ.P. 30(b)(4) to videotape the pretrial deposition of Richard M. Helms, is denied.

## MEMORANDUM ORDER

Defendant CBS has moved for reconsideration of the Court's Order of April 19, 1984, denying it permission to videotape the pretrial deposition of Richard M. Helms. It does so on the ground that two other district courts before whom the dispute is pending—the trial court in the Southern District of New York and the Middle District of Georgia having *in personam* jurisdiction of another non-party witness, former Secretary of State Dean Rusk—have recently authorized videotaping of pretrial depositions upon stringent conditions designed to alleviate the witnesses' concerns about future extrajudicial use of the tapes. CBS submits that inconsistent rules governing discovery in the same case generally are unwise if not inequitable, and it is willing, it says, to accede to similar conditions with respect to Helms' deposition.

For his part Helms continues to oppose videotaping of his deposition on any conditions.

CBS has yet to make any showing, however, that it intends to use Helms' testimony at trial for any probative purpose of its own. So far as appears from the record at present, the deposition CBS plans to take of Helms is to be a routine Rule 30 pretrial deposition directed primarily towards discovery of the testimony to be expected at trial from a witness who, while not yet technically hostile, is unlikely to give evidence favorable to CBS. The interrogation will be, therefore, largely exploratory, and the testimony for the most part inadmissible, and to the extent any portion of it may have impeachment value a transcript can be used as effectively as a tape excerpt.

Therefore, for the foregoing reasons as well as those set forth in the Memorandum and Order of April 19, 1984, it is, this 14th day of May, 1984,

ORDERED, that CBS' motion for reconsideration is denied, without prejudice, however, to the right of any party to apply, upon cause shown, following completion of Ambassador Helms' pretrial discovery deposition taken down by customary stenographic means, for leave to videotape a *de bene esse* deposition of such of his testimony as the party fairly intends, in good faith, to present at trial by means of deposition, subject to such conditions as may be necessary for the protection of the witness.