**UNITED STATES of America, Plaintiff,**

v.

**Martin K. EDWARDS and Francis B. Kendall, Defendants,**

**In re Applications of VIDEO–INDIANA, INC., and Mid-America Radio, Inc., Applicants-Appellants.**

Nos. 80–2718, 80–2719.

United States Court of Appeals, Seventh Circuit.

Argued June 12, 1981.

Decided March 3, 1982.

Donald G. Sutherland, Indianapolis, Ind., for plaintiff.

Irvin B. Charne, Milwaukee, Wis., amicus.

Before CUMMINGS, Chief Judge, FAIRCHILD, Senior Circuit Judge, and EAST, Senior District Judge.[*]

FAIRCHILD, Senior Circuit Judge.

This case raises the question of whether the district court erred in refusing to release to the media, for the purpose of copying and broadcasting to the public during the pendency of a criminal trial, an audio recording which had been admitted into evidence and played in open court. We hold that the case is not moot. Even though the broadcasters sought access to the tape contemporaneous with the trial, long since ended, the underlying dispute is of the type "capable of repetition, yet evading review." Considering all of the circumstances, we cannot say that the district court abused its discretion in denying the broadcasters' request. For guidance in future cases, however, we make clear that there is a strong presumption in favor of the common law right of access to judicial records and that permission to inspect, copy, and disseminate should be denied only where actual, as opposed to hypothetical, factors demonstrate that justice so requires.

## I. Background

The criminal trial of Martin K. Edwards and Francis B. Kendall attracted considerable attention in the media. Edwards, a state Senator and President *Pro Tempore* of the Indiana Senate, and Kendall, a private businessman, had been indicted on charges relating to unlawful payments of money in exchange for influencing legislation.[1] During the course of their trial, on November 19, 1980, an audio recording of a telephone conversation between Edwards and one

---

[*] Senior District Judge William G. East of the District of Oregon is sitting by designation.

1. Details of the alleged scheme are discussed in this court's recent opinion affirming the conviction of co-defendant Kendall, *United States v. Kendall*, 665 F.2d 126 (7th Cir. 1981).

John L. Cline [2] was admitted into evidence and played to the jury. A day earlier, through channels not clear from the record, full transcripts of that recording had been published in *The Indianapolis News* and *The Indianapolis Star* newspapers. Following introduction of the tape,[3] Video-Indiana, Inc., a television broadcasting station, and Mid-America Radio, Inc., a radio station, both of Indianapolis, (collectively, the "Broadcasters"), informally requested permission of the court to copy the audio recording for broadcast to the public. The court took the requests under advisement and suggested that formal applications be filed. The next day, November 20, 1980, the Broadcasters submitted written applications seeking permission to copy, for broadcast contemporaneous with the trial, all video and audio tapes which had been or might be admitted into evidence.[4] On November 21, 1980, the court heard oral argument in support of the requests by counsel for the Broadcasters, and in opposition thereto by counsel for each of the defendants and counsel for the United States. The applications were thereafter denied in an oral decision from the bench.

The court's decision was based on essentially three factors. First, the court expressed concern that mid-trial authorization of access might be viewed as placing a judicial imprimatur upon particular evidence which might be overcome by later testimony, and therefore concluded that pendency of trial was a factor entitled to considerable weight. Second, the court observed that Edwards had yet to stand trial upon several counts of tax evasion which had been severed from the instant charges and that public broadcast of the tape might make it "doubly difficult" to draw a jury for that subsequent proceeding. Despite this potential obstacle, however, the court expressly noted that it was inclined to agree that through proper *voir dire* examination "nevertheless a jury can be selected ... with a fair and impartial attitude." Finally, the court offered the view that a recent resolution of the Judicial Conference of the United States reaffirming the ban against broadcast of trials was a relevant consideration weighing in favor of denying access to the tape.

Subsequently, the Broadcasters filed an appeal in this court. Because the answering brief of defendants Edwards and Kendall was wholly perfunctory in nature and the Government's brief indicated that it would not oppose release of the tape if, as was likely, the second trial of Edwards was completed before oral argument, we asked Attorney Irvin B. Charne of Milwaukee to file a brief and argue as *amicus* in support of the trial court's decision. We are grateful for his assistance.

## II. Mootness

The relief sought by the Broadcasters in their application to the district court was the release of the tapes during the trial. The *amicus* argues that since the trial has now ended contemporaneous access to the tapes is impossible and therefore the appeal should be dismissed as moot.[5] We agree with the Broadcasters that the underlying dispute is "capable of repetition, yet evading review," *Southern Pacific Terminal*

---

2. Cline was initially indicted along with Edwards and Kendall, but all charges against him were subsequently dropped.

3. The briefs before us are somewhat unclear, but it appears that there originally existed three relevant tape recordings. However, counsel for appellants assured the court at oral argument that only one tape was introduced into evidence; that representation was not disputed by *amicus* arguing in support of the decision below.

4. A similar written application was filed on the same day by McGraw-Hill Broadcasting, Inc., which operates a television station in Indianapolis. That request was also denied. McGraw-Hill is not a party to this appeal, and as used herein the term "Broadcasters" refers only to Video-Indiana, Inc. and Mid-America Radio, Inc.

5. The trial of Edwards and Kendall began on November 12, 1980; the district court denied the Broadcasters' application on November 21, 1980; the jury verdicts were returned on December 18, 1980; sentences were imposed and notices of appeal were filed on January 26, 1981.

*Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), and therefore is not moot. It is reasonably foreseeable that in other criminal trials similar applications for access to tape recordings will be made and will be denied. *See Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 426 n.2 (5th Cir. 1981) ("broadcaster's requests for access are continuing and continue to be denied"). It is also likely that in such cases the criminal trials will be of sufficiently short duration that an order denying access will evade appellate review during the period in which contemporaneous access could be granted. *Cf. Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563, 100 S.Ct. 2814, 2821, 65 L.Ed.2d 973 (1980) ("[m]ore often than not ... a closure order 'will evade review ...'"). Thus, while it would be impossible for us to direct the district court to now accord the specific relief requested, mootness does not preclude consideration of the merits. *Accord Belo Broadcasting, supra,* 654 F.2d at 426 n.2; *In Re Application of National Broadcasting Co. (United States v. Myers)*, 635 F.2d 945, 949 n.1 (2d Cir. 1980) (hereafter "*Myers*").[6]

For similar reasons, we find inadequate the Government's suggestion that the case be remanded to the district court for reconsideration of the initial request for access in view of the fact that the trial of Edwards and Kendall has ended and the separate tax evasion charges against Edwards resolved.[7] While a different decision might now be reached based on these changed circumstances, such a procedure would avoid the basic question of whether the Broadcasters were entitled to have access to the tape during the course of the trial. It is that issue we believe must be addressed. Accordingly, we turn to the merits.

**6.** The *amicus* attempts to distinguish *Myers* on the ground that it was the first of a group of several cases in which it was likely that access would be sought to the videotapes there in question, whereas here it is unlikely that the Edwards-Cline tape will ever be used in another prosecution. We are unwilling to so strictly read the "capable of repetition" requirement, and find it sufficient that it is likely that contemporaneous access to different tape recordings will be denied in other criminal proceed-

### III. The Common Law Right of Access to Judicial Records

The Broadcasters do not argue that they were constitutionally entitled to inspect, copy, or broadcast the tape which had been admitted into evidence and played to the jury. Rather, they base their claim upon the common law right of access to judicial records.

#### A.

The keystone for our analysis is the Supreme Court's decision in *Nixon v. Warner Communications*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). There, during the trial of several of ex-President Nixon's former advisers, certain tape recordings were played to the jury in open court and reels of the tapes were admitted into evidence. Transcripts of the tapes furnished to reporters were widely reprinted in the press. At the close of the trial at which four of the defendants were convicted, and following an earlier unsuccessful request to copy, broadcast, and sell to the public portions of the tapes, certain broadcasters petitioned for immediate access to the recordings. The district court denied permission, *United States v. Mitchell*, 397 F.Supp. 186 (D.D.C.1974), but the court of appeals reversed, 551 F.2d 1252 (D.C.Cir.1976). The Supreme Court then reversed again in favor of nonaccess. Justice Powell wrote for the majority:

"It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. . . .

"It is uncontested, however, that the right to inspect and copy judicial records

ings. *See Richmond Newspapers, Inc., supra,* 448 U.S. at 563, 100 S.Ct. at 2820–21 (likelihood of closure orders in other criminal trials sufficient to satisfy "capable of repetition" element).

**7.** Ultimately, the tax evasion charges were never tried because Edwards pleaded guilty to one of the counts and the Government dismissed the remaining counts.

is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes....

"... [T]he decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."

435 U.S. at 597–599, 98 S.Ct. at 1312–1313 (footnotes omitted).

While recognizing that, "It is difficult to distill from the relatively few judicial decisions ... all the factors to be weighed in determining whether access is appropriate," id. at 598–599, 98 S.Ct. at 1312, the Court suggested that it would be proper to consider such matters as whether the information would be " 'used to gratify private spite or promote public scandal' through the publication of 'the painful and sometimes disgusting details of a ... case,' " id. at 598, 98 S.Ct. at 1312, see also id. at 603, 98 S.Ct. at 1314–15; whether the petitioner sought to use court "files ... as reservoirs of libelous statements for press consumption ... or as sources of business information that might harm a litigant's competitive standing," id. at 598, 98 S.Ct. at 1312; whether the court had already "permitted considerable public access" to the contents of the records in question, (e.g., by way of printed transcript, as opposed to tape recording), id. at 599 n.11,[8] 98 S.Ct. at 1313 n.11; whether further access would appreciably enhance public understanding of an "important historical occurrence," id. at 602, 98 S.Ct. at 1314; and whether granting the request would prejudice the due process rights of a criminal defendant, cf. id. at 602 n.14,[9] 98 S.Ct. 1314 n.14. The Court indicated that discretion must be guided by a "sensitive appreciation of the circumstances

that led to ... [the] production [of the materials]," id. at 603, 98 S.Ct. at 1315, but at the same time acknowledged that there is a "presumption—however gauged—in favor of public access to judicial records," id. at 602, 98 S.Ct. at 1314.

The Supreme Court deemed it unnecessary to decide how the balance would be struck based on the above considerations, for it found that "[a]n additional, unique element" controlled disposition of the case. Id. at 603, 98 S.Ct. at 1315. Congress, through the Presidential Recordings Act, had statutorily modified the common law right by specifically restricting public access to the Watergate tapes, and thus decisively tipped the scale against court authorized release.[10]

### B.

Subsequent court of appeals decisions have addressed the critical question left unresolved by Warner Communications, namely the strength of the presumption in favor of public access. Three circuits—the Second, the Third, and the District of Columbia—have held that the presumption is strong and entitled to significant weight in the decisionmaking process. See Myers, supra, 635 F.2d at 952 ("only the most compelling circumstances should prevent contemporaneous public access"); In re Application of National Broadcasting Co. (United States v. Criden), 648 F.2d 814, 823 (3rd Cir. 1981) (hereafter "Criden") ("strong presumption that material introduced into evidence at trial should be made reasonably accessible in a manner suitable for copying and broader dissemination"); In re Application of National Broadcasting Co. (United States v. Jenrette), 653 F.2d 609, 613 (D.C.Cir.1981) (hereafter "Jenrette") ("access may be denied only if ... 'justice so requires' "); United States v. Hubbard, 650 F.2d 293, 317 (D.C.Cir.1980) ("strong presumption in fa-

---

**8.** The Court found it unnecessary to decide whether this factor could ever by itself be decisive.

**9.** The Court found that the district court's principal reason for refusing to release the tapes—fairness to the defendants, who were appealing their convictions—was no longer a consideration, since all appeals had been resolved.

Nonetheless, the suggestion is that in appropriate circumstances this factor is entitled to some weight.

**10.** The Court also rejected arguments in Warner Communications that release of the tapes was required by the First or Sixth Amendments.

vor of public access"); *see also United States v. Mitchell*, 551 F.2d 1252, 1261 (D.C. Cir.1976), *rev'd on other grounds sub nom. Nixon v. Warner Communications, supra*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (party seeking "to interfere with a fundamental common law right . . . [must sustain] burden of demonstrating that justice require[s] denying access to court records"). In contrast, the Fifth Circuit has expressly declined to find an "overpowering presumption in favor of access," and stated that the presumption is merely "*one* of the interests to be weighed" in passing upon an application. *Belo Broadcasting, supra*, 654 F.2d at 434 (emphasis in original).

 We recognize, as does the Fifth Circuit, that the right here in question is of non-constitutional origin and that in a given case "a number of factors may militate against public access." *Id.* at 434. Yet we are equally aware that this common law right supports and furthers many of the same interests which underlie those freedoms protected by the Constitution. As Chief Judge Bazelon wrote in *Mitchell*:

"This common law right is not some arcane relic of ancient English law. To the contrary, the right is fundamental to a democratic state. . . . Like the First Amendment, . . . the right of inspection serves to produce 'an informed and enlightened public opinion.' Like the public trial guarantee of the Sixth Amendment, the right serves to 'safeguard against any

attempt to employ our courts as instruments of persecution,' to promote the search for truth, and to assure 'confidence in . . . judicial remedies.' And . . . like the Fifth and Fourteenth Amendments, the right of inspection serves to promote equality by providing those who were and those who were not able to gain entry to . . . [the] courtroom the same opportunity to hear the . . . tapes."

*Mitchell, supra*, 551 F.2d at 1258 (footnotes omitted; brackets added). *See also Criden, supra*, 648 F.2d at 820–822 (common law right of access serves same interests as constitutional open trial guarantee). Thus, while we are unwilling to go so far as the Second Circuit's statement that only exceptional circumstances will justify non-access, we hold that there is a strong presumption in support of the common law right to inspect and copy judicial records.[11] Where there is a clash between the common law right of access and a defendant's constitutional right to a fair trial, a court may deny access, but only on the basis of articulable facts known to the court, not on the basis of unsupported hypothesis or conjecture. *See, e.g., Criden, supra*, 648 F.2d at 827.[12] We stress that it is vital for a court clearly to state the basis of its ruling, so as to permit appellate review of whether relevant factors were considered and given appropriate weight. *See generally Criden, supra*, 648 F.2d at 819 (articulation of reasons tends to provide a firm base for appellate judgment that discretion was soundly exercised).

---

11. All the more so is this true in the present case since the trial bore upon the conduct of a public official. *See Criden, supra*, 648 F.2d at 822; *Myers, supra*, 635 F.2d at 952.

12. In *Criden*, Judge Dolores Sloviter wrote:
"Considerations of the effect of publicity on a jury are ordinarily matters on which the trial court's judgment is entitled to considerable deference by an appellate court. The trial court has already supervised the selection of one jury and any particular problems which the news coverage in this highly publicized matter created for the selection process would have come to the trial court's attention. Therefore, if the trial court had already experienced difficulty in jury selection, we would be faced with an actual rather than conjectural factor militating against release of the tapes for rebroadcast. However, the trial court's experience was the contrary.

The court stated that 'while virtually all of the prospective jurors called in the Schwartz and Jannotti case had heard or read about the case, most were able to state, truthfully in my view, that their awareness of the case was somewhat vague, and that they had formed no lasting conclusions concerning the guilt or innocence of the defendants.' . . . Accordingly, the danger to defendants' fair trial rights on a possible retrial is not based on the trial court's experience in this case, but rather on its conjecture about possible future difficulties. . . .
". . . [W]e must distinguish between those situations where there is hypothetical prejudice and those where it can be demonstrated that there has been actual prejudice caused by publicity."
648 F.2d at 827.

## IV. Review of the District Court's Ruling

Considering the context in which the decision was made we find it difficult to say that the district court's ruling constituted an abuse of discretion. As of November 21, 1980, no case had been decided by the Supreme Court, the Court of Appeals for the Seventh Circuit, or the district courts of this circuit balancing the interests at stake where the common law right of access collides with the fair trial rights of a defendant or addressing the weight to be attributed to the presumption of access. The record indicates that the judge, faced with a relatively novel demand during the course of a highly publicized trial, spent the entire evening between the day on which the formal applications were filed and the day on which the ruling was made reading the lengthy opinions of the Supreme Court in *Warner Communications*, the Second Circuit in *Myers*, and the District Court for the Eastern District of Pennsylvania in *Criden*.

Apparently he found persuasive the district court *Criden* decision (which was later reversed by the Third Circuit), came down on the side of the fair trial rights of the defendants, and articulated at least three justifications for his decision. Considering all the circumstances, we are unwilling to say that this course of conduct constituted an abuse of discretion.[13]

We turn now to the considerations which influenced the district court.

### A. The Judicial Conference Resolution

█ The district court found that the Judicial Conference's resolution prohibiting the broadcasting of trials (apparently Canon 3A(7) of the Code of Judicial Conduct for United States Judges) was a factor weighing against granting the applications. The same justification was relied upon, in part, by the district court in *Criden*. We find persuasive the Third Circuit's discussion of this factor, and therefore quote it at length:

"[F]ollowing the district court's decision the Supreme Court ruled in the *Chandler [v. Florida]* case [449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981)] that contemporaneous broadcasting of criminal trials was not unconstitutional and thereby alleviated, at least on a constitutional level, the concerns about the effect of possible . . . broadcasting on the integrity of the trial process. Of course, the district court is not precluded from considering that factor in reaching a discretionary decision on release of the tapes. However, we believe the district court failed to appreciate the basic distinction between the effect of a contemporaneous broadcast and the broadcast of tapes made before the trial. The Judicial Conference resolution is based on apprehension about the effect that contemporaneous broadcast of trial proceedings might have on the conduct of the trial itself. This cannot be a relevant factor when the material sought for copying is merely . . . [a tape recording] of a preexisting event, since the participants on the tape cannot posture or otherwise change their behavior to play before a television audience."

648 F.2d at 828–829. *See also Myers, supra*, 635 F.2d at 952 n.5 (distinguishing between copying of physical evidence and broadcasting of testimony of live witnesses); *Jenrette, supra*, 653 F.2d at 620 n.60 (rejecting argument that broadcasting of tapes amounted to impermissible broadcasting of the trial itself).

We conclude that Canon 3A(7) did not require the denial of the Broadcasters' applications.

### B. Pendency of Trial

█ Clearly it is appropriate—indeed necessary—for a court to consider how the granting of an application for access to evidence in the midst of a criminal trial will affect the defendant's right to a fair proceeding. However, the weight to be attributed pendency of trial depends upon the particular circumstances. In the usual case, the jury will have been impaneled, the evidence ruled admissible and presented in court, and the jury admonished to avoid

---

**13.** Of course, nothing in this decision precludes the Broadcasters from seeking post-trial access to the tape for the purpose of copying and broadcasting. Any decision on such a motion shall be guided by and consistent with the principles articulated herein.

exposure to reports of the trial in the news media. Under such circumstances, a court would ordinarily conclude that the possibility that the jurors, despite the admonition, would be unduly prejudiced because of publicity resulting from the inspection and copying of evidence which has already been held admissible is sufficiently remote as to pose no significant risk to a fair trial. *See Myers, supra,* 635 F.2d at 953. In contrast, where an extraordinary level of publicity has made exceptionally difficult the selection of a jury and has created a circus atmosphere around the trial, *cf. Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), or where the administrative and mechanical difficulties attending inspection and copying would disrupt the progress of the proceeding, *compare United States v. Mitchell,* 386 F.Supp. 639, 643 (D.D.C.1975) (opinion of Gesell, J.), *approved in United States v. Mitchell, supra,'* 551 F.2d at 1262–1265, *rev'd on other grounds sub nom. Nixon v. Warner Communications, supra,* denial of access may be warranted. We can state no hard-and-fast rule. Indeed, it is "[b]ecause of the difficulties inherent in formulating a broad yet clear rule to govern the variety of situations in which the right of access must be reconciled with legitimate countervailing public or private interests, the decision as to access is one which rests in the sound discretion of the trial court." *Jenrette, supra,* 653 F.2d at 613. We note, however, that the problem of a jury interpreting the granting of access as judicial endorsement of those items of evidence can normally be resolved by firmly instructing the jury that the court expresses no opinion on the merits of particular testimony or exhibits and by cautioning them to avoid news reports of the trial. We emphasize again the strong presumption in favor of access.

### C. The Possibility of Future Trials

A difficult but related question concerns the effect which the release and broadcast of evidence might have on the ability to impanel fair and impartial juries in other criminal proceedings. The issue may arise, as here, because the defendant has yet to be separately tried on other charges, because

the evidence could reasonably have an effect on trials involving other individuals, or perhaps for other reasons. Where the application is made after trial, while an appeal is pending, it may be proper to consider that reversal would require a new trial.

Much has been written by courts of appeals of other circuits on this question. In general, those courts which find the presumption of access to be strong tend to discount the risk of harm to other proceedings, whereas those which minimize the importance of the presumption accentuate potential jeopardy to other cases. *Compare Mitchell, supra,* 551 F.2d at 1261–1262 (possible prejudice at hypothetical re-trial does not justify infringing right to inspect and copy), *Jenrette, supra,* 653 F.2d at 615–618 (same), *Myers, supra,* 635 F.2d at 954 (alleged risk to a fair trial for other defendants yet to be tried too speculative to justify denial of access), *and Criden, supra,* 648 F.2d at 827 (danger to defendant's fair trial rights at possible re-trial, based on conjecture rather than actual experience in first trial, held insufficient to deny access), *with Belo Broadcasting, supra,* 654 F.2d at 431 (court need not have positive proof of impossibility of assuring yet-to-be-tried defendant a fair trial before access may be denied).

■ It would be folly for us to attempt now, through detailed analysis of other decisions, to state a broad rule covering all possible situations. Rather we address ourselves simply to the relevant circumstances in the present case. The pending tax evasion charges against defendant Edwards made a second trial more than merely hypothetical. The trial judge properly recognized that adverse publicity arising from broadcast of the tape, which clearly implicated Edwards in the extortion scheme, posed a threat to drawing a fair and impartial second jury that was independent of any question of whether the tape would be sought to be introduced at the second trial. The acknowledgement by the judge that the difficulty could be overcome makes the case closer, but does not, in our opinion demonstrate an abuse of discretion where, as here, the court considered both the problem of tainting the current trial and the expected trial.

*V. Conclusion*

Accordingly, the judgment appealed from is

AFFIRMED.