**UNITED STATES of America, Plaintiff,**

v.

**Allen M. DORFMAN, Roy L. Williams, Joseph Lombardo, Thomas F. O'Malley, and Andrew G. Massa, also known as Amos Massa, Defendants.**

**No. 81 CR 269.**

United States District Court,
N.D. Illinois, E.D.

Sept. 7, 1982.

See also, D.C., 542 F.Supp. 345.

Douglas P. Roller, Gary Shapiro, Mark Vogel, U.S. Dept. of Justice, Chicago, Ill., for plaintiff.

Albert E. Jenner, Jr., Michael J. Rovell, Linda Listrom, Jenner & Block, Harvey M. Silets, Silets & Martin, Chicago, Ill., for defendant Dorfman.

Thomas A. Wadden, Jr., William Krebs, Wadden, Scherr, Krebs & Gitner, Washington, D.C., for defendant Williams.

George J. Cotsirilos, Robert M. Stephenson, Cotsirilos & Crowley, Ltd., Chicago, Ill., for defendant Massa.

Harry J. Busch, Sherman C. Magidson, Chicago, Ill., for defendant Lombardo.

William G. Hundley, Larry S. Gondelman, Hundley & Cacheris, P.C., Washington, D.C., for defendant O'Malley.

Lawrence Gunnels, Charles J. Sennet, Reuben & Proctor, Chicago, Ill., for intervenors Chicago Tribune, Crawford, Dow Jones & Co., Inc., ABC, CBS and NBC.

A. Daniel Feldman, Steven R. Gilford, Isham, Lincoln & Beale, Chicago, Ill., for intervenor Field Enterprises, Inc.

Edward L. Foote, Winston & Strawn, Theodore A. Sinars, Harris, Burman, Sinars & Jiganti, Chicago, Ill., for non-party interceptees.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

In this criminal case, defendants are charged in a multi-count indictment with crimes including conspiracy to bribe a United States Senator in violation of 18 U.S.C. §§ 201(b)(1) and 371 (1976). That fact would pique the public's interest. Moreover, the defendants include the President of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America ("Teamsters"), two defendants said by the government to be involved in organized crime, and two officials of the Teamsters' Central States, Southeast and Southwest Areas Pension Fund who were allegedly part of a scheme to defraud the Pension Fund, in violation of 18 U.S.C. § 1343 (1976). If that were not enough to make the matter of some considerable public interest and import, this case involves what appears to be the most pervasive wiretap in the history of the federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510–20 (1976 & Supp. II 1978) ("Title III").

Thus, the case has generated a substantial amount of public interest. Understandably, the publicity has distressed defendants, who fear that it may prejudice potential jurors and jeopardize defendants' right to a fair trial.

On March 22, 1982, we ruled that defendants would receive an evidentiary hearing on certain aspects of their allegations that the electronic surveillance involved in this case was unlawful. A four week evidentiary hearing followed, in which defendants ventilated their charges that the government's surveillance was tainted by various forms of misconduct, including deliberate misrepresentations made to former Chief Judge Parsons of this court in order to obtain authorization to conduct the surveillance, and that the surveillance unreasonably intruded on defendants' privacy. Allegedly to minimize the adverse publicity which they expected the hearing would generate, defendants moved that the hearing be closed to the public. We denied the motion, but ruled that Title III granted defendants a protected interest in preventing the public disclosure of their electronically intercepted conversations prior to a determination that the interception was lawful. Therefore, we ruled that surveillance materials (applications, transcripts, logs, summaries, etc.) would be received under seal as exhibits and would not be disclosed in open court. This procedure, we believed, struck an appropriate balance between the public's interest in attending judicial proceedings and defendants' protected privacy interests under Title III. *Accord, United States v. Cianfrani,* 573 F.2d 835, 855–60 (3d Cir.1978). Our ruling was affirmed on appeal. *See United States v. Dorfman,* No. 82–1462 (7th Cir. Mar. 25, 1982). During the hearing, we adhered to the sealing procedure, and the bulk of the nearly 200 exhibits introduced into evidence at the hearing were not made public.[1]

---

1. At the hearing, only transcripts of intercepted conversations were introduced. No tapes were introduced or played in open court. Thus, whatever special problems may be posed by

On June 1, 1982 we ruled that virtually all of the electronic surveillance said by the government to be relevant to the merits of the case was lawful. On July 9, 1982, defendants moved the court to reconsider its ruling. We denied the motion on July 13, 1982. Appeals have been taken from those orders by defendants and by certain non-defendants whose intercepted conversations will be offered at trial.

Now, Chicago Tribune Company, William B. Crawford, Jr., CBS, Incorporated, Dow Jones and Company, American Broadcasting Companies, Inc., National Broadcasting Company, and Field Enterprises, Incorporated, all of whom have earlier been granted leave to intervene in the case on defendants' motion to close the suppression hearing, have filed a motion in which they request that the court unseal the exhibits admitted into evidence under seal during the suppression hearing and grant them permission to inspect and copy the exhibits. Defendants oppose the motion. The motion is also opposed by non-defendants David Dorfman, Sol Schwartz, Morris Weiser, Morton J. Harris, and Ira Burman, all of whom were intercepted during the course of the government's surveillance and argue that their privacy rights would be infringed if the court permits the seal to be removed and grants the public access to the exhibits.

All parties recognize that there is a common law right to inspect and copy judicial records. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 1311, 55 L.Ed.2d 570 (1978) (dictum); *United States v. Edwards,* 672 F.2d 1289, 1292–93 (7th Cir.1982); *Belo Broadcasting Corp. v. Clark,* 654 F.2d 423, 429–30 (5th Cir.1981); *In re National Broadcasting Co. (Jenrette),* 653 F.2d 609, 612 (D.C.Cir.1981); *United States v. Criden,* 648 F.2d 814, 819

(3d Cir.1981); *In re National Broadcasting Co. (Myers),* 635 F.2d 945, 949–50 (2d Cir. 1980); *United States v. Dean,* 527 F.Supp. 413 (S.D.Ga.1981); *United States v. Carpentier,* 526 F.Supp. 292, 295–96 (E.D.N.Y. 1981).[2] "What transpires in the court room is public property." *Craig v. Harney,* 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947). Exhibits introduced at an evidentiary hearing are part of the record of a case. *See United States v. Hubbard,* 650 F.2d 293, 299 (D.C.Cir.1980); *United States v. Mitchell,* 551 F.2d 1252, 1259–60 (D.C.Cir. 1976), *rev'd on other grounds sub nom. Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); Fed.R.App.P. 10(a) ("The original papers and exhibits filed in the district court ... shall constitute the record on appeal in all cases."). Thus, the common law right of access extends to exhibits used in an evidentiary hearing, especially when they are relied upon by the court in reaching its decision, as were the transcripts and other surveillance materials at issue here. *See United States v. Hubbard,* 650 F.2d 293, 217 (D.C.Cir.1980); *Wilk v. American Medical Association,* 635 F.2d 1295, 1299 n. 7 (7th Cir.1980); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 529 F.Supp. 866, 897–901 (E.D.Pa.1981); *Hearst Corp. v. Vogt,* 62 A.D.2d 840, 406 N.Y.S.2d 567 (1978). *See generally Doe v. Stegall,* 653 F.2d 180 (5th Cir.1981).

While there may be an exception to the common law right of access where the documents sought are essentially irrelevant to the issues at the evidentiary hearing, *see United States v. Hubbard,* 650 F.2d 293 (D.C.Cir.1980), that is not the case here. The exhibits to which access is sought were critically important at the suppression hear-

---

permitting the public to copy tapes played in open court, *see e.g.,* Note, *Copying and Broadcasting Video and Audio Tape Evidence: A Threat to the Fair Trial Right,* 50 Fordham L.Rev. 551 (1982), are not present.

**2.** While courts agree that the right of access exists, they do not agree on its strength. For example, in *Belo Broadcasting* the court held that the right was not sufficiently weighty to create a presumption in favor of access. 654 F.2d at 433–34. At the other extreme is *Myers,*

which held the right to be so strong that access can only be denied in extraordinary circumstances, at least where the evidence is received in open court. 635 F.2d at 952. In this circuit, "there is a strong presumption in support of the common law right to inspect and copy judicial records." *Edwards,* 672 F.2d at 1294 (footnote omitted). In *Nixon v. Warner Communications,* the Supreme Court found it unnecessary to decide the question. *See* 435 U.S. at 602–03, 98 S.Ct. at 1314.

ing. The alleged governmental misconduct at issue in the hearing involved the representations made to Chief Judge Parsons at the time the government obtained authority to conduct electronic surveillance, as well as the subsequent conduct of the surveillance. All of this activity was memorialized in the exhibits. In fact, the oral testimony which was public was often little more than the witnesses' attempts to explain what was contained in the sealed exhibits, though usually in cryptic terms so that the substance of the sealed exhibits would not be publicly revealed. The pivotal significance of the exhibits is perhaps best reflected in our opinion of June 1, which cites no less than 43 exhibits. Moreover, we referred to virtually all of the exhibits in the process of preparing the opinion. Judge MacKinnon has aptly stated the importance of exhibits in a case such as this.

> The record of a trial is no less a part of the proceeding than the actual examination of witnesses. Where, as here, the controversy presented to the court was limited to a single major issue—the validity of the search—and where the defendants contended that their claim of invalidity was proven by *all* the documents they caused to be admitted into evidence, making the documents available in the public record becomes even more important. Absent such access, the public's opportunity to assess the validity of the court[']s ruling as applied to these criminal defendants would be virtually nonexistent. [ ] The central issue in the suppression proceedings . . . would be obscured from the public and the press. . . .

The requirement for public *disclosure* of the evidentiary record in a court proceeding which results in a judicial ruling naturally flows from the constitutional requirement that the trial be public. Even though a motion to suppress may not be a "trial" there is no difference in the ultimate requirement that the *record* be public. A judicial proceeding cannot be said to be public if the public be denied access to the evidence admitted as relevant to the issues before the court. *It is as important to public disclosure of judicial proceedings that the public be able to read written evidence in the record as it is that they be able to hear oral testimony.*

*United States v. Hubbard,* 650 F.2d 293, 330 (D.C.Cir.1980) (dissenting opinion) (emphasis in original).[3] Here too, defendants contend that virtually all the evidence is relevant because it demonstrates, through its volume as well as its substance, the impermissibly broad scope of the government's surveillance, and because it shows that the government misled Chief Judge Parsons when it obtained authorization to conduct the surveillance. The exhibits were plainly central to the suppression hearing,[4] and the common law right of access is applicable to them.

■ Defendants and non-defendants opposing disclosure claim that the common law right of access has no application to exhibits received in evidence under seal, relying on a footnote from the Second Circuit's decision in *Myers.*[5]

3. Defendants and those non-defendants that oppose disclosure rely heavily on the majority opinion in *Hubbard,* which held that disclosure of part of the record of a suppression hearing was improper. However, the majority opinion rests on the court's conclusion that the material sought by the press was irrelevant to the ruling on the motion to suppress. That fact is mentioned no less than nine times by the majority. See 650 F.2d at 301 & n. 18, 302 & nn. 21 & 22, 316, 317, 318, 321. That is not the case here.

4. *See also Zenith Radio Corp. v. Matsushita Electrical Industrial Co.,* 529 F.Supp. 866, 901 (E.D.Pa.1981).

5. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), held that Congress can create statutory exceptions to the common law right. Defendants also argue that Title III is such a statutory exception. Title III, in 18 U.S.C. § 2518(8)(a) (1976), requires that the contents of any wire or oral interception under the statute be placed under seal as a prerequisite to disclosure of the contents under § 2517(3). Section 2517(3), in turn, permits disclosure of information concerning or derived from electronic surveillance at a hearing if the contents of the intercepted communication were obtained in accordance with Title III. Section 2518(8)(b) requires that

If, for justifiable reasons, a particular item were entered into evidence under seal, the presumption [in favor of access] would obviously not apply, because for that item of evidence, the session of court was not public.

635 F.2d at 952 n. 4 (dictum).[6] However, defendants overlook the qualification contained in the *Myers* footnote, that the evidence be received under seal "for justifiable reasons." If there is no longer adequate justification to maintain the seal, then presumably the *Myers* dictum is no bar to disclosure. More fundamentally, however, if the common law presumptive right of access were to vanish merely because of the presence of a seal on evidence, serious first amendment problems would be created. We construe the common law right of ac-

cess to require an adequate justification for maintaining a seal on the exhibits subsequent to a determination that the surveillance in this case was lawful, since to do otherwise would violate the first amendment.[7]

Until recently, the question of whether the public enjoyed a first amendment right of access to judicial proceedings was a relatively open one. In a series of cases involving access to prisons, the Supreme Court declined to recognize any special right of access held by the press superior to the rights of the general public. *See Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); *Pell v. Procunier,* 417

applications and orders for electronic surveillance be sealed and may only be disclosed upon a showing of good cause. Finally, § 2515 prohibits the receipt of evidence regarding electronic surveillance if the disclosure of that information would be in violation of Title III. *See generally In re Kansas City Star,* 666 F.2d 1168 (8th Cir.1981). This statutory scheme appears to create an anomaly, since it seems to prohibit a court from receiving Title III applications, orders and interceptions into evidence prior to an adjudication of the lawfulness of the surveillance, so that a court cannot receive the material in evidence at a suppression hearing in order to determine the lawfulness of the interception. The anomaly is avoided by construing the statute to permit the receipt of material into evidence at a suppression hearing under seal. *See United States v. Cianfrani,* 573 F.2d 835, 855–57 (3d Cir.1978). However, once it has been determined that the interception was lawful, disclosure of interceptions received in evidence at the hearing is lawful under § 2517(3), *id.* at 859–60. Moreover, once a motion to suppress is made, the government is required to disclose the wiretap applications and orders in order to litigate the motion to suppress, and good cause is present to remove the seal on those materials once introduced in evidence at the hearing, *see Kansas City Star,* 666 F.2d at 1176. Thus, Title III acts as an exception to the right of access only "prior to the determination by the court that such communication was intercepted lawfully," *Cianfrani,* 573 F.2d at 857. Once we held that the surveillance was lawful, Title III permits disclosure and does not operate as an exception to the right of access, *id.* at 859–60.

We did conclude that many telephone conversations were unlawfully intercepted. *See United States v. Dorfman,* 542 F.Supp. 345, 393–97 & n. 58 (N.D.Ill.1982). Under §§ 2515

and 2517(3), intervenors are not entitled to that material. No intervenor challenges the constitutional validity of those sections.

We note that if defendants were correct and the statute prohibited public disclosure of evidence introduced at a suppression hearing which was lawfully obtained, the statute would run afoul of the first amendment. *See infra* pp. 882–886.

6. The *Myers* footnote was cited with approval in *Kansas City Star,* 666 F.2d at 1173 n. 5. That case, however, did not involve disclosure of evidence received at a suppression hearing, and the court explicitly reserved that issue. *See id.* at 1176 n. 9.

7. Defendants claim that intervenors' access claim under the first amendment is doomed by *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609, 98 S.Ct. 1306, 1317, 55 L.Ed.2d 570 (1978), where the Court rejected a first amendment claim that the media had a right to inspect and copy tapes which had been played in open court during a criminal trial. The Court noted that the media had access to transcripts of the tapes so that the prohibition on copying the tapes did not amount to a restriction on the flow of information which would implicate the first amendment. Here, however, the exhibits have not been displayed in open court, and the media does not have access to their contents. Here, there is a restriction in the flow of information of the type absent in *Warner Communications.* For the same reason, *Belo Broadcasting Corp. v. Clark,* 654 F.2d 423, 427–28 (5th Cir.1981), another copying of tapes case relied on by defendants, is inapposite. *See generally* Note, *supra* note 1, at 559–60.

U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). However, the Court, in dicta, had hinted that some access right existed, noting that "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972). The Court's first encounter with a first amendment claim involving access to judicial proceedings came in *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). There, by a 5–4 vote, the Court affirmed an order closing a pretrial suppression hearing to the public. The bulk of Justice Stewart's majority opinion addresses the question whether the closure offends the sixth amendment's guarantee of a public trial. However, Justice Stewart also briefly dealt with the first amendment, stating that while he was willing to assume that the closure order implicated the first amendment, the courts below had properly balanced the defendant's right to a fair trial which would be endangered by a public suppression hearing against the first amendment interests of the public. *See id.* at 392–93, 99 S.Ct. at 2911. One of the members of the majority, Justice Powell, explicitly stated that in his view the first amendment protects public access to pretrial suppression hearings. *See id.* at 397–98, 99 S.Ct. at 2914 (Powell, J., concurring). *But see id.* at 404–06, 99 S.Ct. at 2918–19 (Rehnquist, J., concurring). In light of the majority's unclear holding on the first amendment question, considerable confusion was generated by the opinion. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 602, 100 S.Ct. 2814, 2841, 65 L.Ed.2d 973 (1980) (Blackmun, J., concurring in the judgment).

The access issue returned to the Court in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). While seven members of the Court expressed their view that the first amendment sharply limits the ability of courts to close criminal trials to the public,[8] no majority opinion was issued. Chief Justice Burg-er's plurality opinion began by noting that there is a long history of public access to criminal trials, as opposed to suppression hearing. *See* 448 U.S. at 563–69, 100 S.Ct. at 2820–23. This tradition was "no quirk of history", but essential as insurance that trials are conducted fairly and the public can observe and understand the criminal justice system, *id.* at 569–73, 100 S.Ct. at 2823. The Chief Justice went on to state that the right to discuss the criminal justice system which is protected by the first amendment would be "eviscerated" if the public could not observe and hence comprehend the workings of that system. Thus, a necessary corollary of the right to discuss the criminal justice system is the right to attend criminal proceedings, *id.* at 575–80, 100 S.Ct. at 2826–29. He concluded, "Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." *Id.* at 581, 100 S.Ct. at 2829 (footnote omitted).

Chief Justice Burger's approach in *Richmond Newspapers* relied heavily on the history of access to public trials; a history the Court had found lacking in the context of pretrial suppression hearings in *Gannett.* However, Justice Brennan, concurring in the judgment, announced a less tradition-bound approach. Justice Brennan wrote that the first amendment plays a structural role in our constitutional scheme, by guaranteeing self government through a process of constitutionally protected public discussion and debate. *Id.* at 587, 100 S.Ct. at 2833. "Implicit in this structural role is not only 'the principle antecedent that debate on public issues should be uninhibited, robust, and wide-open,' but the antecedent assumption that valuable public debate—as well as other civil behavior—must be informed." *Id.* (footnote and citation omitted) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). Access to information is accordingly required if the structural function of the first amendment is to be

---

8. Only Justice Rehnquist dissented. Justice Powell did not participate. However, he was already on record expressing his view that the first amendment limits the power to close criminal proceedings to the public as a result of his concurring opinion in *Gannett.*

protected and public debate is to be informed. *Id.* 448 U.S. at 588–89, 100 S.Ct. at 2833–34. In Justice Brennan's view, the first amendment guarantees access where required in order to protect the public's interest in obtaining information about and hence meaningful democratic control over a particular governmental process. *Id.* at 589, 100 S.Ct. at 2834. In the context of a criminal trial, Justice Brennan believed that publicity serves to vindicate the public interest in the trial process, since openness helps maximize public confidence in the criminal justice system, ensures that the public can critically understand the way the law operates and correct abuses in the process, and aids in accurate factfinding. *Id.* at 593–97, 100 S.Ct. at 2836–38.

The Court's most recent encounter with the question of access to criminal proceedings came in *Globe Newspaper Co. v. Superior Court,* —— U.S. ——, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). In *Globe Newspaper,* the Court struck down a Massachusetts statute which required closure of sex-offense trials during the testimony of minor victims. The Court relied much less on Chief Justice Burger's tradition-bound approach in *Richmond Newspapers,* and much more on Justice Brennan's structural approach.[9] The Court began by noting that the first amendment right of access is designed "to ensure that the individual citizen can effectively participate in and contribute to our republican form of self-government," 102 S.Ct. at 2619, and "to ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one." *Id.* (quoting *Mills v. Alabama,* 384 U.S. 214,

218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484 (1966)). The Court concluded that "in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the criminal process—an essential component in our structure of self-government." *Id.* 102 S.Ct. at 2620 (footnote omitted). *Globe Newspaper* signals the adoption of a structural approach to the right of access.[10]

Applying the structural approach to the type of pretrial suppression hearing had in this case, we conclude that the first amendment creates a presumptive right of public access to the proceeding at issue here. Chief Judge Seitz, writing for the Third Circuit, recently canvassed the reasons why this is so.

> Both the Supreme Court and this Court have recognized that a pretrial criminal hearing often is the most critical stage of a criminal proceeding. Decisions reached at the pretrial hearings often determine whether the defendant or the Government wants to proceed to trial. In many cases, the pretrial hearing is the only adversary proceeding the accused will have in resolving his case. Indeed, most criminal prosecutions consist solely of pretrial procedures. The public's vital interest in evaluating the public officials who work in the criminal justice system cannot be fully vindicated unless the public and press can attend pretrial hearings. Otherwise, much of the work of prosecutors and trial judges may go unscrutinized.

**9.** Significantly, Justice Brennan wrote the opinion of the Court in *Globe Newspaper.* Chief Justice Burger dissented.

**10.** Commentators have argued that the structural approach is the most analytically sound explanation for a first amendment right of access, since it relies on a value contained in the first amendment—protection of self-government—rather than merely promoting efficiency in the criminal process, a value more readily identified in the sixth amendment's right to a public trial. *See* Fenner & Koley, *The Rights of the Press and the Closed Court Criminal Proceeding,* 57 Neb.L.Rev. 442, 477–81 (1978); Lewis, *A Public Right to Know About Public*

*Institutions: The First Amendment as a Sword,* 1980 Sup.Ct.Rev. 1, 3–9, 22–25; Note, *The Right to Attend Criminal Hearings,* 78 Colum.L. Rev. 1308, 1314 (1978); Casenote, *Constitutional Law—First Amendment Right of Access to Governmental Information: A Presumption of Open Trials,* 14 Creighton L.Rev. 853, 857–58, 871–73 (1981); *The Supreme Court, 1979 Term,* 94 Harv.L.Rev. 75, 152–54 (1980); Note, *Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings,* 91 Harv.L.Rev. 1899, 1903–09 (1978); Note, *First Amendment—Constitutional Right of Access to Criminal Trials,* 71 J.Crim.L. & Criminology 547, 555–56 (1980).

Of equal importance, pretrial hearings in criminal cases typically involve objections to the propriety of police conduct. In fact, the pretrial hearing may be the only point in the trial process at which the conduct of law enforcement officers is at issue. Because such conduct frequently occurs outside the public view, beneficial public scrutiny may never take place if not at the hearing itself.

*United States v. Criden,* 675 F.2d 550, 556–57 (3d Cir.1982).

The fact that this case involves charges of government misconduct in conducting electronic surveillance magnifies the structural interest in public access to the hearing at which these charges were aired.

These interests [in disclosure] are strengthened where the interception of private conversations by surreptitious means is involved. Congress has recognized the need to protect the private conversations of all citizens from electronic interception except in the most limited and controlled circumstances. Where there are allegations that the police have violated Congress's commands in this area, all citizens have a strong interest in learning the facts. This is especially true since electronic surveillance, like much other police conduct, takes place in secret, veiled from the view of ordinary citizens. Suppression proceedings that test the legality of police conduct in recording the private conversations of citizens should be subject to the public trial requirement.

*United States v. Cianfrani,* 573 F.2d 835, 850 (3d Cir.1978). If suppression hearings were closed, the public would be deprived of the opportunity to evaluate the workings of Title III and the courts' rulings on charges of governmental misconduct, a result which would subvert the structural function of the first amendment by precluding informed public discussion and debate on these issues of critical public import. Moreover, in the broadest sense, defendants also have an interest in public access. In the long run, perhaps the most fundamental guarantee that electronic surveillance will not be abused is the protection offered by public scrutiny which can only be gained if access to suppression hearings is permitted. We believe the first amendment protects the public's right of access to the pretrial suppression hearing held in this case.[11]

■ Since the common law right of access is designed to serve the same interests of the public as is the first amendment right of access, *see United States v. Criden,* 648 F.2d 814, 820–23 (3d Cir.1981), the common law right should be construed no more narrowly than the constitutional right. Under the first amendment test enunciated in *Globe Newspaper,* "[w]here, as in the present case, the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is

11. A number of courts and commentators have similarly argued that the interest in public access to criminal proceedings protected by the first amendment is applicable to pretrial criminal hearings. *See United States v. Clark,* 475 F.2d 240, 246–47 (2d Cir.1973); *United States ex rel. Bennett v. Rundle,* 419 F.2d 599, 606 (3d Cir.1969); *Cromer v. Superior Court,* 109 Cal. App.3d 728, 167 Cal.Rptr. 671 (1980); *United States v. Edwards,* 430 A.2d 1321, 1343–46 (D.C.1981); *Ashland Pub. Co. v. Asbury,* 612 S.W.2d 749 (Ky.1980); *Westchester Rockland Newspapers, Inc. v. Leggett,* 48 N.Y.2d 430, 399 N.E.2d 518, 423 N.Y.S.2d 630 (1979); *State ex rel. Dayton Newspapers, Inc. v. Phillips,* 46 Ohio St.2d 457, 466–67, 351 N.E.2d 127, 133–34 (1976); *Commonwealth v. Hayes,* 489 Pa. 419, 414 A.2d 318 (1980); *Richmond Newspapers, Inc. v. Commonwealth,* 222 Va. 574, 281 S.E.2d 915 (1981); Fenner & Koley, *Access to Judicial Proceedings: To* Richmond Newspapers *and Beyond,* 16 Harv.C.R.–C.L.L.Rev. 415, 432–38 (1981); Fenner & Koley, *supra* note 10, at 481–82; Note, *The Right to Attend Criminal Hearings,* 78 Colum.L.Rev. 1308, 1309–10 (1978); Recent Decisions, *Fair Trial/Free Press—Pretrial Suppression Hearings Presumptively Closed to Public When Adverse Publicity Threatens Impaneling of Impartial Jury in County of Venue,* 47 Geo.Wash.L.Rev. 319, 332–34 (1978). *See generally State v. Burak,* 37 Conn.Supp. 627, 431 A.2d 1246 (1981); *Herald Association, Inc. v. Ellison,* 138 Vt. 529, 419 A.2d 323 (1980); Note, *Evaluating Court Closures after* Richmond Newspapers: *Using Sixth Amendment Standards to Enforce a First Amendment Right,* 50 Geo.Wash.L.Rev. 304, 310–18 (1982). *But see San Jose Mercury-News v. Municipal Court,* 30 Cal.3d 498, 638 P.2d 655, 179 Cal.Rptr. 772 (1982).

narrowly tailored to serve that interest." 102 S.Ct. at 2620.[12] In order to avoid constitutional infirmity, we construe the common law right to extend to the exhibits at issue, even though they were properly received in evidence under seal,[13] and will require a justification for maintaining the seal sufficiently weighty to pass constitutional muster.[14]

We now turn to the question whether maintaining the seal on the exhibits is justified by a compelling interest, and whether the seal is narrowly tailored to serve that interest.

Defendants and non-defendants resisting disclosure forward two interests which they claim justify denial of the pending motion. The first is the protection of defendants' constitutional right to a fair trial. The Constitution requires trial courts to take steps sufficient to ensure that potential jurors are not prejudiced by pretrial publicity. *Gannett Co. v. DePasquale,* 443 U.S. 368, 378, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979). All parties agree that protecting defendants from prejudicial pretrial publicity constitutes a compelling interest sufficient to justify a denial of public access to the exhibits. The parties disagree, however, as to whether disclosure of the exhibits would create a sufficient risk of prejudice to justify denial of the motion.

■ The risk of prejudicial publicity justifies a denial of access only where it is demonstrated that there is a substantial risk of unduly prejudicial publicity which is likely to bias potential jurors. The risk must be demonstrable, not speculative. *In*

*re National Broadcasting Co. (Jenrette),* 653 F.2d 609, 615–16 (D.C.Cir.1981); *United States v. Criden,* 648 F.2d 814, 827–28 (3d Cir.1981); *United States v. Mitchell,* 551 F.2d 1252, 1261–62 (D.C.Cir.1976), *rev'd on other grounds sub nom. Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). *See also In re San Juan Star Co.,* 662 F.2d 108 (1st Cir. 1981); *Kansas City Star Co. v. Fossey,* 230 Kan. 240, 630 P.2d 1176 (1981). "[A] court may deny access, but only on the basis of articulable facts known to the court, not on the basis of hypothesis or conjecture." *United States v. Edwards,* 672 F.2d 1289, 1294 (7th Cir.1982).

■ The bulk of the sealed material relating to the surveillance orders of January 29, March 1, March 30 and April 7, 1979, and the fruits thereof, does not speak to the offenses charged in the indictment. Some of it does purport to detail the alleged relationship between the defendants and organized crime, but this has been publicly described in our decision of June 1, 1982. Under these circumstances, the immediate release of the materials relating to the January 29—April 7 orders is not inappropriate.

■ The materials relating to the April 28, 1979 order are of a different nature. While they were presented to us during the suppression hearing they were only tangentially involved. We did not describe them in our June 1 decision. They speak to the subject matter of the indictment. Access to the materials should be postponed, since

---

12. There is no dispute that what happened here was a closure of court proceedings within the meaning of *Globe Newspaper.* The sealed exhibits were critical to an understanding of the suppression hearing; in many ways they *were* the suppression hearing. We conducted the hearing in a manner which was functionally equivalent to requiring the press and public to leave the courtroom every time an exhibit was introduced or referred to. As the earlier discussion demonstrates, a denial of access to written evidence introduced at an evidentiary hearing deprives the public of a meaningful opportunity to understand the hearing, and therefore amounts to a denial of public access to the hearing in a significant way.

13. We take it as given that the evidence was properly received under seal at the hearing. No intervenor has contended otherwise. See note 5, *supra.*

14. Our holding only applies to the exhibits received in evidence at the hearing. We need not decide whether there is a first amendment right in sealed materials not introduced in evidence, though we note other courts have concluded that there is not. *See Koster v. Chase Manhattan Bank,* 93 F.R.D. 471, 474 n. 10 (S.D.N.Y. 1982); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 529 F.Supp. 866, 908–15 (E.D.Pa.1981).

given the pattern of pretrial publicity associated with this case, there is a demonstrable, immediate and substantial probability that this material, if disclosed, would find its way to potential jurors. *See Sacramento Bee v. United States District Court,* 656 F.2d 477 (9th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2257, 72 L.Ed.2d 861 (1982); *Belo Broadcasting Corp. v. Clark,* 654 F.2d 423 (5th Cir.1981).

However, we must ensure that the postponement of access is no broader than necessary to protect defendants' right to a fair trial. Under the circumstances, the seal need be maintained only until the jury is impaneled and sworn. This, in our judgment, is the type of case where once the jury is sworn and admonished to avoid exposure to publicity regarding the case, the defendants' right to a fair trial will have been adequately protected and the seal will no longer be required.

[T]he weight to be attributed pendency of trial depends upon the particular circumstances. In the usual case, the jury will have been impaneled, the evidence ruled admissible and presented in court, and the jury admonished to avoid exposure to reports of the trial in the news media. Under such circumstances, a court would ordinarily conclude that the possibility that the jurors, despite the admonition, would be unduly prejudiced because of publicity resulting from the inspection and copying of evidence which has already been held admissible is sufficiently remote as to pose no significant risk to a fair trial. In contrast, where an extraordinary level of publicity has made exceptionally difficult the selection of a jury and has created a circus atmosphere around the trial, *cf. Sheppard v. Maxwell,* 384 U.S. 333 [86 S.Ct. 1507, 16 L.Ed.2d 600] (1966) . . . denial of access may be warranted. We can state no hard and fast rule. . . . We note, however, that the problem of a jury interpreting the granting of access as judicial endorsement of those items of evidence can normally be resolved by firmly instructing the jury that the court expresses no opinion on the merits of particular testimony

or exhibits and by cautioning them to avoid news reports of the trial. We emphasize again the strong presumption in favor of access.

*United States v. Edwards,* 672 F.2d 1289, 1296 (7th Cir.1982) (citation omitted). While these exhibits do contain information which will be referred to at trial, we do not believe it is so inflammatory that a firm admonition to the jurors to avoid publicity will be insufficient to protect defendants' right to a fair trial. Moreover, the jurors will have been subjected to what the court fully intends to be a searching and careful voir dire, which is a powerful device for screening out potential jurors who have been or are likely to be prejudiced by publicity. *See Jenrette,* 653 F.2d at 617; *Criden,* 648 F.2d at 827–28; *Myers,* 635 F.2d at 953–54. *See also Nebraska Press Association v. Stuart,* 427 U.S. 539, 563–65, 96 S.Ct. 2791, 2804–05, 49 L.Ed.2d 683 (1976). While this case has generated some troubling publicity, it has not proceeded in a circus atmosphere similar to that of the *Sheppard* case. We believe a careful voir dire coupled with a firm admonition to the jury will protect defendants' rights. Once that has occurred, we see no justification for maintaining the seal in order to protect defendants' right to a fair trial. This is especially true given the strong first amendment interest that would be jeopardized if disclosure were delayed until after trial. We should not blind ourselves to the realities of the news media. The media is concerned primarily with contemporaneous events. If disclosure is delayed until after trial, public and media interest in this case will have lessened, and in all likelihood the electronic surveillance in this case will not receive effective public scrutiny. The first amendment demands that the press not be silenced at the time it can be most effective. *See Mills v. Alabama,* 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). Strong considerations support disclosure of this material prior to the point at which public and media interest in this case has faded.

 The second consideration which defendants and non-defendants resisting

disclosure argue justifies a denial of access is the protection of the privacy of persons intercepted during the surveillance in this case. It is true that some of the exhibits contain transcripts of private conversations. It is also true that the protection of privacy was a major concern of Congress in enacting Title III, *see, e.g., Gelbard v. United States,* 408 U.S. 41, 48, 92 S.Ct. 2357, 2361, 33 L.Ed.2d 179 (1972), and that under certain circumstances protection of privacy may be a sufficiently compelling interest to justify a denial of access. For example, in *In re KSTP Television,* 504 F.Supp. 360 (D.Minn.1980), the court denied a request for access to a videotaped pictures of a rape victim bound and helpless immediately prior to her rape, in order to protect the victim's privacy. No similarly compelling privacy interests are present here, however. The exhibits do not contain intimate conversation; most of the transcripts involve business conversations between the defendants and their associates.[15] To the extent privacy interests are at stake here, they are fully protected by our prior ruling on the motion to suppress, in which we suppressed interceptions which fell into a pattern of surveillance which was unduly intrusive of the interceptees' privacy. *See United States v. Dorfman,* 542 F.Supp. 345, 393–97 & n. 58 (N.D.Ill.1982). The press and public will not receive access to that material.[16] Privacy interests in the remaining material must be considered to be diminished, in that those conversations, in our judgment, were lawfully overheard by government agents. *Cf. United States v. Dorfman,* 690 F.2d

1217 at 1227–1229, (7th Cir.1982) (non-defendants' privacy interests are adequately protected by ruling on defendants' motions to suppress). In any event, because the exhibits do not contain material of a highly intimate or personal nature, the protection of privacy is not an interest sufficiently compelling to justify maintenance of the seal. *See Jenrette,* 653 F.2d at 619–20; *Criden,* 648 F.2d at 829; *Mitchell,* 551 F.2d at 1263–64.[17]

Intervenors' motion to unseal exhibits admitted into evidence at the suppression hearing in this case is granted in part and denied in part in accord with the views expressed herein. The parties are directed to submit a draft order in conformity herewith.[18]

15. Defendants have claimed throughout this litigation that the very volume of surveillance, extending over one year and thousands of conversations, is in itself unduly intrusive and violative of privacy interests. While that argument might justify denying the press and public access to the whole of the intercepted material on privacy grounds, a question not now before us, that argument is not relevant to the instant motion. The exhibits contain only a tiny fraction of the material intercepted during the course of surveillance and none of the material involved contains highly private, sensitive or intimate conversations.

16. Governments' Exhibit 11 and Defendants' Exhibit 100 & 101 are summaries of many intercepted conversations, including many which were unlawfully intercepted. We are disin-

clined to redact the exhibit. We have concluded that under Sections 2515 and 2517(3) these exhibits should remain under seal. See note 5, *supra.*

17. The Third Circuit rejected a privacy argument similar to that made here in *United States v. Cianfrani,* 573 F.2d 835, 860 (3d Cir.1978).

18. We have withheld issuing this decision while the appeals from the orders denying suppression were pending. On September 2, 1982 the Court of Appeals dismissed the appeal of the defendants, and affirmed our ruling denying the motions to suppress of the non-defendants. *See United States v. Dorfman,* 690 F.2d 1217 (7th Cir.1982).